609 So.2d 416 (1992)
Daries Frank MITCHELL
v.
STATE of Mississippi.
No. 89-KA-0409.
Supreme Court of Mississippi.
October 1, 1992.
Rehearing Denied December 31, 1992.
Bobby Garraway, Bassfield, William L. Ducker, Purvis, Daries Frank Mitchell, Pro Se, Leakesville, for appellant.
Michael C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and PITTMAN and McRAE, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
Daries Frank Mitchell was indicted, tried and convicted of armed robbery in the Circuit Court of Pearl River County, Mississippi. He was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections and has appealed to this Court, presenting five issues for decision.

FACTS
On May 21, 1986, between 1:00 and 1:30 p.m., a lone gunman entered the First National Bank of Picayune in Picayune, Pearl River County, Mississippi. Mae Smith, the *417 branch manager, and Linda Mitchell were the only employees present at the time of the robbery. When the masked gunman entered the bank, Mae Smith was standing behind a teller window while Linda Mitchell was in the kitchen. The gunman proceeded to pull a gun out of his pocket and told Smith "Lady, I want your money. I want large bills". Frightened, Smith complied with his demands and put the money from the cash drawer into a white cloth bag which the gunman had given her. Included in this money were both "bait money" and a dye pack containing tear gas. The "bait money" consisted of ten (10) five dollar bills, whose serial numbers were recorded with the bank.
After she gave the money to the gunman, Smith was ordered to go down the steps leading to the kitchen and stay there. The ladies were unable to call the police from the kitchen phone but did call the main branch office, which notified the police of the robbery. An accounting of Smith's cash drawer showed $2,582.00 missing. At the time of the robbery, the bank's video camera was not working, so no pictures of the gunman were obtained. Smith described the gunman as six-feet one inch tall, weighing around 240 pounds, wearing a tan jacket, work pants, and tan boots. She stated that the gunman had very large hands and was dark complected, as if he worked outdoors. She described his voice as very coarse. She did not see the vehicle that was used in the robbery, but did say that she heard a car outside, which "sounded real rough."
Smith was unable to forget the gunman's voice, knowing that she had heard it before. It was not until two days later, while relaxing in her bathtub, that she remembered and recognized the gunman's voice as that of Daries Frank Mitchell, who is known as "Bing." Ms. Smith contacted the police the next day to relay this information. Smith testified that she recognized the appellant's voice because when she worked at the main branch years earlier, she would handle all of his transactions. She stated that they would often drink coffee together when he was in town between jobs. Although only seeing the appellant twice in the last six years due to her promotion to branch manager, Smith stated that she recognized his distinct voice. Once Mae Smith identified the gunman's voice, the police began a search for the suspect, D.F. "Bing" Mitchell as well as a green Chrysler automobile seen fleeing the bank.
On the day of the robbery, Tommy Davis was working at a construction site next to the bank. Davis was riding in a pick-up truck on his way to lunch when he noticed something suspicious when they passed the bank. He saw a man leaving the bank who appeared to stick something under his jacket while walking to his car. At that time, Davis made the comment "he just robbed the bank" to the other two workers in the truck. Having observed the man for about five seconds, Davis described him as about six-feet two, 250 pounds, blond hair and with a mustache. The man proceeded to get into his car and immediately pull out into the street, narrowly missing another motorist. The car, by coincidence, pulled out directly behind the truck in which Davis was riding.
Davis testified that he turned around and viewed the driver of an early 1970's green Chrysler which was traveling about fifteen feet behind him. The close proximity enabled Davis to get a good look at him. The driver of the truck, in which Davis was riding, slowed down to have the driver of the green Chrysler pass so he could get the car's tag number. However, the man refused to pass, and after about thirty seconds veered off onto another road. Upon seeing police cars outside the bank while returning from lunch, Davis stopped and gave the police his information.
Sherry Hoover, the manager of "Bogie's", a lounge at the Ramada Inn in Slidell, Louisiana, testified that "Bing" Mitchell was at the lounge on Friday afternoon and evening, May 23, 1986; that Mitchell had been in the lobby lounge earlier that day but entered "Bogie's" around 5:00 p.m. when it opened; that Mitchell was visibly intoxicated and dropping money all on the floor; that Hoover and Tonja Mallory, a cocktail waitress, who was dating Mitchell *418 at that time, picked up Mitchell's money for him; that fearing he would either spend it all or lose it, Hoover and Mallory got the money, counted it, wrapped it in a napkin with Mitchell's name, wrote the total amount on it, and put it in a separate slot in the register; that the total amount of the money put into the register was $1,350.00 and they left $30.00 out to allow Mitchell to buy drinks.
Hoover testified that the only time Mitchell's money was touched in the register was to give him $50.00 later on that evening. When "Bogie's" closed at 1:00 a.m., Hoover counted the money out to Tonja Mallory in the presence of Mitchell. At that time, Tonja Mallory took two $100 bills from Mitchell's money, while in his presence, as payment for typing that she was doing for Mitchell. Both Hoover and Mallory stated that Mitchell was served Cokes, 7-UP's, and coffee in an effort to sober him up because he appeared intoxicated when he first came into the lounge. Hoover resumed serving Mitchell alcohol towards the end of the evening.
Butch Jacobs, a Slidell policeman who also worked security for the Ramada Inn while off duty, worked in the lounge that night, following his 4-12 p.m. shift with the police department. Earlier that day, Jacobs was informed by his superiors that members of the Picayune Police Department were investigating a suspect who frequented the hotel lounge. Officer Jacobs saw the undercover policemen in the lounge that night, but avoided them, since they were observing Mitchell. At closing time, Officer Jacobs told Hoover that he was involved in an investigation and he needed to see the night's receipts from the lounge. The search of the receipts produced one $10 bill and two $5 bills with red dye on them. Issuing the manager a receipt, Officer Jacobs confiscated the bills as evidence. The serial number of one of the $5 bill's corresponded to the list of "bait" money bills that were reported stolen from the First National Bank of Picayune.
After obtaining the money from the Ramada Inn Lounge, Officer Jacobs followed Mitchell and his girlfriend Tonja Mallory to City Lights, another bar which is several hundred feet outside the city limits of Slidell. Since the bar was outside of his jurisdiction, Officer Jacobs called Detective Randy Caire of the St. Tammany Parish Sheriff's Department. While waiting for Detective Caire, Officer Jacobs observed Mitchell and Mallory leave the bar and return to room 116 at the Ramada Inn. Upon Detective Caire's arrival, Jacobs, Caire, and Picayune policeman Lee Holcomb proceeded to City Lights and asked the manager to show them that night's receipts. An inspection revealed four $10 bills tainted with red dye. Although none of the serial numbers matched the "bait" money, the bills were confiscated and a receipt was given to the manager.
Officer Jacobs called his sergeant, Joe Triolo, and informed him of the events. When Sergeant Triolo arrived at the Ramada Inn, the officers discussed the possibility of obtaining a search warrant. However, due to the early morning hour, they decided that they would try to get Mitchell to consent to a search of his room.
After several unanswered knocks on the door, Officer O'Neal went to the front desk where he instructed the operator to call room 116 and tell the occupants that the police were outside their room. Soon after, Mitchell answered, peering through a chained door. Officer Jacobs, who knew Mitchell from working security at the hotel, identified himself to Mitchell and asked him if he could talk with him. Officer Jacobs was told to "go away". However, when Officer Jacobs told Mitchell that he needed to speak with him concerning a bank robbery in Picayune, Mississippi, Mitchell responded "wait a minute", unlocked the door and came outside. Mitchell was given his Miranda rights and told he was not under arrest, but that the officers had some questions for him. After Mitchell told the officers that he was not armed, and had no firearms in the room, the conversation between them relaxed.
Officer Jacobs asked Mitchell to sign a consent form which would allow the officers to search his room and car. Mitchell contended that he never signed the consent *419 form and that the signature is a forgery. Only three officers talked to Mitchell, and there were no signs of coercion or a show of force in order to get Mitchell to sign the form. Further, Officers Triolo and Caire witnessed Mitchell sign his name and attested to this on the consent form.
Once Mitchell's consent was received, Officers Jacobs, Triolo, and Caire went inside the room. When Mitchell was asked if he had any money on him, he responded by pulling three $5 bills tainted with red dye out of his pants pockets. After Mitchell told the police that was all the money he had, Tonja Mallory stated that she had some money that Mitchell had given her earlier and she voluntarily retrieved her purse. An inspection of the two $100 bills which Mitchell had given her revealed the presence of red dye. Tonja stated that the rest of Mitchell's money was in the glove box of her car which was parked outside. She and Mitchell had used her car to go to City Lights earlier that evening. Tonja went with the police and unlocked her car, allowing Detective Caire to pull a purple Crown Royal bag from the glove box of the vehicle. Inside the cloth bag was a Tupperware container filled with money, which contained five $5 bills whose serial numbers matched the "bait" money stolen from the bank. The officers proceeded back to the hotel room, where Mitchell was arrested.
Mitchell's car was impounded and taken to the Slidell Police Department, in order to perform an inventory search in the daylight. This search revealed five red dyestained paper towels from the passenger floorboard, four face clothes containing red dye from the driver's floorboard, a tan jacket with a dye stained pocket, and a dyestained $20 bill between the front two seats.
A swatch of fabric was cut and sent with the above items to the F.B.I. laboratory for analysis. This analysis revealed that the red dye was in fact M.A.A.Q., a red dye used in the banking security industry as a component in the exploding dye packs. A knife was found on the car's floorboard and a sawed off shotgun was found on the front seat. A bottle of clear liquid was found in the back seat, labeled as white vinegar, but its contents were never analyzed. Mitchell's explanation for the red dye was that it was horse liniment, which he used in his horse business.
Tonja Mallory testified that on May 23, 1986, when she asked Mitchell where he got all that money, he told her three different stories. First, that he had cashed in an insurance policy, second that his mother had loaned it to him, and third, that he had robbed a bank; that Mitchell was trying to start up a business venture, which was going to require a lot of capital, and made the statement several times that the only way he was going to get the money was to rob a bank.
After a discovery period consisting of several continuances, Mitchell finally submitted his alibi. He claimed that his friend, Al Noyes, borrowed his car that day and that Noyes robbed the bank. Al Noyes had lost his job, and was "hiding" his company car so he would not have to turn it in. Mitchell would allegedly leave his car at the Ramada Inn for Noyes to use and Mitchell would take the shuttle into New Orleans to conduct business and pick up his car later that evening.
Al Noyes has never been located to be questioned, and was subsequently unavailable at trial. Tonja described Al Noyes as clean shaven, grey haired, heavy set man who wore glasses. She stated that he and Mitchell look nothing alike. When asked about May 21, 1986, the day of the robbery, Tonja stated that she went to Picayune early that morning to drive a friend's car home because that person had drunk too much the previous evening. She stated that she called Mitchell that morning and asked him to drive her back to Slidell. Mitchell told her that he could not because he had an important meeting at the bank, but that he would meet her at 4:00 p.m. at the Ramada Inn. When he showed up, he gave Tonja a $100 bill and told her to start a tab. Tonja did not notice if the bill contained red dye or not.
Mitchell presented Ed Gauley as an alibi witness, who stated that he had talked to *420 Mitchell around 1:15-1:30 p.m. in the Ramada Inn lobby on the day of the robbery. When asked how he remembered seeing Mitchell that day, he explained that he didn't remember initially, but that Mitchell reminded him of the day and the circumstances of their conversation, which pertained to a proposed business venture.
ISSUES
I. WHETHER THE LOWER COURT ERRED IN NOT SUSTAINING DEFENDANT'S MOTION TO DISMISS BECAUSE OF THE UNCONSTITUTIONAL DELAY IN BRINGING HIM TO TRIAL AND BECAUSE OF THE LACK OF A SPEEDY TRIAL?
II. WHETHER THE LOWER COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION FOR A CHANGE OF VENUE?
III. WHETHER THE LOWER COURT ERRED IN ADMITTING INTO EVIDENCE EXHIBITS # 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 29, 29A, and 34, WHICH WERE OBTAINED IN RELIANCE OF AN ALLEGED INVALID CONSENT TO SEARCH FORM?
IV. WHETHER THE LOWER COURT ERRED IN GRANTING JURY INSTRUCTION S-2?
V. WHETHER THE LOWER COURT ERRED IN FAILING TO HAVE A BIFURCATED TRIAL WITH A GUILT PHASE AND A SENTENCING PHASE?

DISCUSSION

I. AND II.
The appellant contends under issue one that he was denied a speedy trial. He claims that 441 days elapsed between his arrest and trial. However, the statutory 270-day rule attaches at the time of arraignment, and appellant was never arraigned. The record reflects that Mitchell did not want a speedy trial and it was mutually agreed that neither side would push for a speedy trial. According to the trial judge, when a person waives the right to a speedy trial, as was done in the case at bar, the person is arraigned later, usually right before trial. Handley v. State, 574 So.2d 671, 674 (Miss. 1990); Payne v. State, 363 So.2d 278, 279 (Miss. 1978).
For constitutional purposes, appellant's right to a speedy trial attached at the time he was arrested. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), sets out four factors by which an appellant's right to a speedy trial may be determined, i.e., (1) length of delay; (2) reason for delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant as a result of the delay.
Subsequent to his arrest, the appellant was represented over the period of time between then and his actual trial by three different attorneys at three successive times. Numbers one and two were appointed attorneys and number three was a hired attorney. We have carefully considered and applied the Barker factors to the facts of this case and are of the opinion that appellant fails the test. The lower court did not err in ruling that there was no speedy trial violation and the issue is rejected.
Appellant contends number two that the lower court erred in overruling his motion for a change of venue. This Court will not disturb the ruling of the lower court where the sound discretion of the trial judge in denying a change of venue was not abused. Harris v. State, 537 So.2d 1325, 1328 (Miss. 1989); Cabello v. State, 490 So.2d 852, 854-855 (Miss. 1986); Weeks v. State, 493 So.2d 1280, 1285-87 (Miss. 1986); Wiley v. State, 484 So.2d 339, 342-43 (Miss. 1986); White v. State, 495 So.2d 1346, 1349 (Miss. 1986).
Appellant produced witnesses consisting of his former brothers-in-law, a business partner, a long time friend and a bail bondsman, who testified that Mitchell could not get a fair trial in Pearl River County. To the contrary, the news director of the local AM/FM radio stations testified that she has lived in Pearl River County for fifteen years and has never heard of the *421 appellant; that appellant came to the station twice to see the news director and she did not know who he was; and that the radio station only broadcast a resolution passed by the Mayor commending the policemen for making an arrest in the robbery case, without ever mentioning Mitchell's name. The Mayor of Picayune and the news director testified that there had been little talk about the case in the community. Only four articles were published in the Picayune, Mississippi, and Slidell, Louisiana, newspapers. The latter paper is not circulated in Pearl River County. The last article appearing in the Picayune paper was sixteen months prior to appellant's trial.
We are of the opinion that the lower court did not err in denying the motion for change of venue and the issue is rejected.

III.
Appellant contends that exhibits found while searching his car were the result of a forged consent and that he gave no consent to the search of his automobile. The items follow:

 Exhibit Description
 6 .......... 5 paper towels on floorboard
 7 .......... 4 white face clothes on floorboard
 8 .......... tan jacket on back seat
 9 .......... clear plastic and blue binder found between the front seats
 10 .......... $20 bill found between the front seats
 11 .......... white shirt, jeans, cap, and bottle of clear liquid on back
 seat
 12 .......... orange colored envelope found in car
 13 .......... one section of the Louisiana Business Journal and one white
 towel found in car
 14-24 ....... photographs of car's interior before it was searched
 29-29A ...... three $5 bills taken from Mitchell's person while in room
 116 of the Ramada Inn
 34 .......... piece of cloth taken from seat cover of Mitchell's car

The items set out above, with the exception of the jeans and cap, contained the chemical M.A.A.Q. used by currency security companies in their dye packs. Appellant also contends that, due to his intoxicated state, he was unable to voluntarily consent. Although the original consent forms could not be located for introduction at trial, Rule 1004(1) of the Mississippi Rules of Evidence provides that the original is not required and other evidence of the contents of a writing is admissible, if the original is lost or destroyed.
The prosecution showed at trial that the original was sent to the District Attorney's office in Covington, Louisiana, where neither the form nor the file could be found. Officers Jacobs, Triolo, and Caire testified that they witnessed Mitchell sign the form in the early morning hours of May 24, 1986, and that the document offered at trial was an authentic copy of the lost original. At the suppression hearing, appellant's attorney stated they were not contesting appellant's physical condition at the time of the alleged consent but only the validity of the signature. The officers further testified that, although appellant had been drinking, he was aware of the circumstances and, in fact, asked questions about the consent form. Tonja Mallory, a female present in the room at the time of the search, testified that appellant seemed to understand what was going on and that he "sobered up, pretty quickly". She also was in charge of the room and authorized the consent to search the room. State v. Ruiz, 360 So.2d 1320 (Fla.App.2d Dist. 1978).
The issue is rejected.

IV. AND V.
Appellant contends that the lower court erred in granting Instruction S-2 for the State. However, Instruction D-3 and D-5 *422 are the appellant's instructions. Appellant offered no objection to Instruction S-2, which he has assigned as error. Therefore, the issue is barred and rejected.
The appellant contends that the lower court erred in failing to have a bifurcated trial with a guilt phase and sentencing phase. Rule 5.13, Uniform Criminal Rules of Circuit Court Practice, states that there may be bifurcated trials in all felony cases in which the defendant is not subject to receive the death penalty. The rule is permissive rather than mandatory and a bifurcated trial may be had at the discretion of the trial judge. See Taylor v. State, 452 So.2d 441, 451 (Miss. 1984). The record does not reflect that the appellant requested a bifurcated trial. The issue is without merit and is rejected.
There being no reversible error in the trial below, the judgment of the lower court is affirmed.
CONVICTION OF ARMED ROBBERY AND SERVE A SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
ROBERTS, J., not participating.