779 So.2d 1140 (2001)
C. Douglas GULLEY a/k/a C. Douglas Gulley, Jr., Appellant,
v.
STATE of Mississippi, Appellee.
No. 1999-KA-01047-COA.
Court of Appeals of Mississippi.
January 9, 2001.
*1142 John M. Colette, Jackson, for Appellant.
Office of the Attorney General by Jean Smith Vaughan, for Appellee.
Before McMILLIN, C.J., LEE, and PAYNE, JJ.
PAYNE, J., for the Court:
¶ 1. C. Doug Gulley appeals his conviction of seven counts of embezzlement from a jury's verdict in the Circuit Court of Jackson County. He was sentenced to serve ten years on each of six counts of embezzlement, to run concurrently, ten years on the seventh count, to be served consecutively, with the sentence in the seventh count suspended, to ten years of postrelease supervision, and a fine of $7,000. Contending that the trial court committed reversible error in refusing to change venue, in admitting evidence that was misleading and confusing, in denying his motion to dismiss for a faulty indictment and because of the cumulation of trial court errors, Gulley appeals to this Court. Finding no reversible error, we affirm his conviction.

*1143 FACTS
¶ 2. Appellant Doug Gulley was arrested and charged with thirty-five counts of embezzlement of clients's funds. Gulley was a general agent for Minnesota Mutual Insurance Company and was in the business of selling insurance and other investment products on behalf of Minnesota Mutual in his business, Gulley & Associates. The State proceeded at trial on only seven counts of the thirty-five count indictment.
¶ 3. On behalf of the State, Kim Erikson of the Secretary of State's office testified. Erikson, the lead investigator on the matter, testified that after spending a number of days in Gulley's offices conducting an audit, a search warrant was issued and all of Gulley's business and personal records were seized. Erikson and members of her staff culled through the documents and compiled the information which, she testified, showed that Gulley embezzled clients' funds.
¶ 4. Seven of Gulley's former clients testified at trial. In sum, they testified that at the time they invested money with Gulley, they believed that they were investing in Minnesota Mutual products. Several did indicate that they needed their funds invested in a manner which allowed them to liquidate and get their hands on the cash if they needed it. Furthermore, the evidence showed that each had made checks payable, ranging in amounts from $3,000 to $100,000, to Minnesota Mutual, Ascend or Eaton Vance, all Minnesota Mutual companies. Each investor testified that Gulley instructed them to whom they were to make their checks payable.
¶ 5. Gulley deposited the monies from the seven investors in a Magnolia Federal Bank checking account, account number XXXXXXXXXXXX. Gulley referred to the Magnolia Federal account as a "pooled trust account." The signature cards for the Magnolia Federal account reflected that Gulley and his wife had signatory authority and that the account was styled "C. Douglas Gulley or Elizabeth A. Gulley JTROS D/B/A Gulley and Associates."
¶ 6. Several of the account summaries prepared by Gulley for some of the seven investors showed that the money was in a "pooled trust account." According to Gulley, the pooled trust account offered his clients a higher rate of return on their investment and allowed them the ability to liquidate their investment more rapidly and without the harsh penalties imposed by other Minnesota Mutual financial products. Out of this account, Gulley paid the expenses of Gulley Financial Group or placed the money in other Gulley & Associates accounts so that those particular funds might not be available from the pooled trust account when the investor needed them.
¶ 7. Representatives of Minnesota Mutual testified that in January of 1998 they were informed by one of Gulley's former associates of the possibility that Gulley had misappropriated client funds. Thereafter, Minnesota Mutual began its own investigation. On March 24, 1998, the Magnolia Federal checking account was closed by Gulley and Minnesota Mutual accepted the balance of the account in the amount of $16,127.54 from Gulley. In a letter dated March 24, 1998, Gulley resigned as a general agent for Minnesota Mutual. On March 25, 1998, Gulley issued a letter to Union Planters Bank[1] authorizing Union Planters to provide to Minnesota Mutual any information requested by the company regarding Gulley & Associates account number XXXXXXXXXXXX. Minnesota Mutual representative, Kevin Jacobson, testified that Gulley's letter of authorization was required because Minnesota Mutual did not have access to the Magnolia Federal checking account.
¶ 8. Gulley, testifying on his own behalf, emphatically denied stealing or embezzling *1144 client funds. Gulley believed that his clients were aware that they were investing in a pooled trust account which yielded a higher return than the long-term investment options offered by Minnesota Mutual. Gulley stated that, as a general agent for Minnesota Mutual, he was permitted by the company to offer financial products which Minnesota Mutual did not provide or offer which included the Gulley Financial Group pooled trust account. According to Gulley, the pooled trust account was an investment in the business of Gulley & Associates. Consequently, Gulley admitted that he accepted the money from these seven clients and that he placed the funds in an account which was used for "the investment in Gulley & Associates." Out of this account, Gulley paid the expenses of Gulley & Associates which were both business and personal expenses.
¶ 9. Gulley deposited into the pooled trust account one of the checks written by the seven investors in question. The evidence shows that prior to a deposit of an investor's funds there was a low balance in the pooled trust account. Checks were then written by Gulley on the funds in the pooled trust/Magnolia Federal account and was then deposited into other Gulley & Associates checking accounts at other banks. Thereafter, from the various checking accounts, Gulley paid the expenses of his business and personal expenses. He paid loan notes on vehicles, lease payments, credit card bills, utility bills, employee salaries and others.
¶ 10. At trial, Gulley emphasized that his clients were investing in his business and receiving the agreed upon interest rates for their investments. Gulley withdrew funds as requested by a particular investor which was subtracted from their pooled trust account investment.
¶ 11. After the jury found Gulley guilty and after sentencing, he filed post-trial motions for a judgment of acquittal or alternatively for a new trial. From the denial of his post-trial motions, he appeals.

ANALYSIS

I. Change of Venue
¶ 12. Gulley argues that the extensive pretrial publicity in his case demanded a change of venue and that he did not receive a fair trial because of the trial court's refusal to grant his motion to change venue. Gulley presented a motion to change venue prior to trial on which a pretrial hearing was held. The trial court delayed ruling on the matter until voir dire. A venire of sixty-two persons was empaneled. After determining that forty-six members of the venire had heard of Gulley's case, individual voir dire of those forty-six persons ensued. Five members of the venire were struck for cause on the basis that each had indicated that they could not be fair and impartial having already determined for themselves Gulley's guilt. Following the sessions of individual voir dire, nineteen members were struck for cause and the circuit court denied four of Gulley's challenges for cause. Gulley maintains that ultimately the jury contained four jurors who had heard or read about Gulley's case.
¶ 13. In support of his motion for change of venue, Gulley attached copies of twenty-eight news articles involving his case that were printed and published in the Jackson County area between March 20, 1998 and September 7, 1998. At trial which began on May 24, 1999, Gulley provided two more news articles and transcripts of television reports broadcasted in the Jackson County area between March 19, 1998 and April 8, 1999. Gulley had also provided the affidavits of two citizens and live testimony from one citizen in the Jackson County area stating that Gulley could not receive a fair trial in Jackson County because extensive media publication of the case caused the jury pool to be tainted.
¶ 14. In particular, Gulley points to comments made by the district attorney to a local newspaper which was published the day before the jury was selected. Gulley *1145 contends that the following statements by the district attorney which appeared in the local newspaper were improper:
Bradley [the district attorney] said the case put together by Secretary of State Eric Clark's investigators is strong and will prove Gulley took money from potential investors and converted it for his own personal use. "They did a great investigation," Bradley said. "It was a huge investigation and the facts are there.... I don't think there's been enough publicity in this case to bias a juror. I think we can get a fair jury to hear this case."
Gulley challenges that the district attorney's statements were in violation of the Mississippi Rules of Professional Conduct Rule 3.6(a) which prohibits a lawyer from making "extrajudicial statement[s] that a reasonable person would expect to be disseminated.... [and] will have a substantial likelihood of materially prejudicing an adjudicative proceeding." Gulley also relies on Uniform Circuit and County Court Rule 9.01 which states:
Prior to conclusion of the trial, no ... prosecuting attorney, ... may release or authorize release of any statement for dissemination by any means of public communication on any matter concerning:.... The defendant's guilt or innocence, or other matters relating to the merits of the case, or the evidence in the case.
Gulley contends that his right to a fair trial was inhibited in part by the district attorney's public comments on the eve of trial and that he should have been granted a change of venue because her public comments were read by several jury members.
¶ 15. "One of the fundamental hallmarks of our legal system is an accused's right to a fair trial before an impartial jury." Hickson v. State, 707 So.2d 536, 541 (Miss.1997). The trial court is required to "guard against even the appearance of unfairness" when impaneling a jury. Mhoon v. State, 464 So.2d 77, 81 (Miss.1985). When the defendant maintains that he cannot obtain an impartial jury without a change of venue, the decision to deny such a motion is within the trial judge's sound discretion. Porter v. State, 616 So.2d 899, 905 (Miss.1993). "[T]his Court will not disturb the ruling of the lower court where the sound discretion of the trial judge in denying change of venue was not abused." Harris v. State, 537 So.2d 1325, 1328 (Miss.1989). In determining if a judge has abused that discretion, we look to the completed trial to ascertain whether the accused was prejudiced. Winters v. State, 473 So.2d 452, 457 (Miss.1985); see also Fisher v. State, 481 So.2d 203, 220 (Miss.1985) (holding that motion for change of venue should be granted where "under the totality of the circumstances it appears reasonably likely that, in the absence of such relief, the accused's right to a fair trial may be lost").
¶ 16. Section 99-15-35 of the Mississippi Code provides:
On satisfactory showing, in writing, sworn to by the prisoner, made to the court, or to the judge thereof in vacation, supported by the affidavits of two or more credible persons, that, by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and impartial trial in the county where the offense is charged to have been committed, the circuit court, or the judge thereof in vacation, may change the venue in any criminal case to a convenient county, upon such terms, as to the costs in the case, as may be proper.
Miss.Code Ann. § 99-15-35 (Rev.2000). Once a defendant presents to the trial court an application for a change of venue with two affidavits affirming the defendant's inability to receive a fair trial in a particular location, a presumption rests in his favor that it is impossible for a fair trial to be had in that particular location. Hickson, 707 So.2d at 541.
¶ 17. Gulley attached two affidavits to his motion for change of venue in *1146 which the affiants believed that Gulley could not get a fair trial in Jackson County because of pretrial publicity. In addition, Gulley produced a witness at the hearing on the matter who testified that in his opinion there had been a large amount of publicity such that Gulley would not likely get a fair and impartial jury in that county. Accordingly, Gulley successfully raised a rebuttable presumption under our statutory law to demonstrate that an impartial jury could not be impaneled. Thus, the prosecution was charged with rebutting the presumption that Gulley could not obtain an impartial jury panel in Jackson County. See Johnson v. State, 476 So.2d 1195, 1211 (Miss.1985).
¶ 18. The prosecution called several witnesses to rebut Gulley's position on the venue issue. First, the prosecution called Jackson County Circuit Clerk Joe Martin, Jr., who testified that he came into regular contact with the citizens of Jackson County and that Gulley's case was not a topic of general conversation. Also testifying for the State was Nancy Hayes, an employee with the tax assessor's office in Jackson County, who indicated that in her opinion Gulley's case had not been a hot topic of conversation among Jackson County citizens. She stated that she thought Gulley would be able to get a fair trial in the county. John Lansford also testified at the hearing stating that he believed Gulley could get a fair trial in Jackson county. After listening to all of the testimony at the hearing, the trial judge ruled that he would reserve ruling on the issue until after voir dire. After voir dire and the individual voir dire sessions of those who indicated they had previously "heard" of Gulley's case, the trial court denied Gulley's motion to change venue on the basis that the crimes involved were not so heinous that the passions of the community and jurors were aroused and that the majority of the prospective jurors did not follow the media attention given to the case and as a result knew very little about Gulley's case. The trial court stated:
So, true, there were five that have already been struck for cause because they said they could not be fair. There are others who will be struck for cause, because they left me with the impression that they had secured a lot of information about this case, a lot of which would not be admissible. And the Court is going to certainly not allow those jurors, when they have indicated some indication that they felt he was guilty, to serve on a criminal jury.
But when we take all of those away, I think we're still going to find that we have a great majority of the number of jurors here who, number one, said they knew very little about the case; number two, had no great interest in the case from a factual standpoint; and number three, said they could be fair and impartial.
I've heard their testimony. I've looked them in the eye. I believe them when they tell me that they will be those that said they would be fair and impartial will be fair and impartial....
But on the pre-trial publicity issue, there was a good amount of publicity, I will admit that. Fortunately, a great majority of the jurors didn't pay any attention to it, in my opinion. The ones that did and the ones that have reservations about serving or have expressed some reservations won't be allowed to serve. But I do think that, I do think that the jury will be fair and impartial, and if I didn't think that, I would change the venue, as I said before. But I just respectfully disagree with counsel for the defendant on that issue. And so I'm going to deny the motion, you know, at this time.
¶ 19. Twelve jurors were selected along with two alternates. During the trial, two jurors were excused and the two alternate jurors were utilized. Of the twelve jurors who convicted Gulley, seven of them had stated in voir dire that they had heard of Gulley's case. Juror number two indicated in voir dire that she had first heard of the *1147 case the day before trial and did not recall the defendant's name. She stated that she could be fair and impartial and base her decision on the evidence presented. Juror number seven recalled seeing an article in the paper over a year prior to trial but had no recollection of what the case was about. Juror number eight stated that she had read a couple of articles about the case but on the day of trial could not recall then what the case was about. She stated she had just glanced at the newspaper article she had seen. Also, she recalled that the morning of trial a news report on the radio indicated that Gulley's trial was beginning jury selection that day. Jurors number seven and eight both stated that they could be fair and impartial if selected for jury duty.
¶ 20. Juror eighteen indicated that she had skimmed two or three articles about Gulley's case but only remembered his name and not the details of the case. She informed the court that she could be fair and impartial and judge Gulley's guilt or innocence on the evidence presented. Juror nineteen could not recall how he had heard about the case but that it had been from media reports. He stated that he knew it was an embezzlement case but that he did not believe much of anything that he read in the newspaper.
¶ 21. Juror thirty-eight stated that he had heard about Gulley's case from the newspapers and television but did not recall what the case was about. He stated that he had not read anything recently about the case. Juror thirty-eight indicated that he had heard of the case by skimming the headlines in the newspaper, though he stated he rarely ever read the newspaper. He stated that he remembers seeing the headlines over the last year and as recently as a few days before trial. He denied seeing anything concerning the case on television or on the radio. He knew it was an embezzlement case, but that was all he knew. He stated he had not formed an opinion about Gulley's guilt or innocence and that he felt as though he would be a fair and impartial juror.
¶ 22. Having reviewed the individual voir dire sessions, we are unable to conclude that the trial court erred in denying Gulley's motion for a change of venue. While a number of juror's had "heard" of the case and of those who served on the jury, none of the responses to the voir dire questions showed any bias or prejudice to Gulley's innocence or guilt. In addition, nothing in the record evinces any passion or outrage toward Gulley. Accordingly, we determine today that the State successfully rebutted the presumption of prejudice and that the actual persons serving on the jury panel in this case were fair and impartial. Harris, 537 So.2d at 1328-29.
¶ 23. As to the district attorney's comments the day prior to trial, we first note that an ethical violation by the prosecutor does nothing to negate the guilt of an indicted defendant. Notwithstanding that fact, we find that in this case the district attorney's comments were improper and in violation of Rule 3.6(b)(4) of the Rules of Professional Conduct and Uniform Rules of Circuit and County Court Practice 9.01 prohibiting extrajudicial statements about the guilt or innocence of a defendant. Her statement that the evidence would show that Gulley embezzled money was in fact a comment on his guilt. The better practice would have been to refuse to make any comments on the case until trial concluded. Although the district attorney may be subject to ethical sanctions for such a violation, that does not per se have any effect on the fairness of the trial. The trial judge had to consider all the issues but not act as an attorney discipline panel in a criminal case against the indicted defendant. Despite the improper pretrial statements made by the district attorney, there is no evidence in the record suggesting that Gulley was denied his right to a fair trial by an impartial jury. Voir dire of the individual jury members showed that Gulley did not suffer any prejudice *1148 by such comments, and therefore his rights to a fair trial were not abrogated.

2. Summary Charts.
¶ 24. Kim Erikson with the Secretary of State's office produced a number of "summary charts" which she used at trial to demonstrate to the jury the flow of money in the "pooled trust account." As to each of the seven counts of embezzlement, Erikson used the charts to show that after Gulley deposited a sum reflecting the amount given to him by the investor, checks were drawn on the same account for personal and business expenses and/or placed in other Gulley & Associates accounts. Additionally, the charts reflect a low balance in the Magnolia Federal account prior to the deposit of each of the investor's checks. In most cases, an immediate withdrawal was made by Gulley in excess of the prior balance and the charts reflected such. Erikson explained to the jury that the charts did not reflect every transaction in the accounts for time periods depicted. To do so, Erikson testified, would have resulted in producing too many charts to be helpful to the jury. She stated that she sought to streamline the proceedings by producing the summary charts.
¶ 25. Gulley objected prior to trial and during trial to the use and admission of the charts on the basis that they were inaccurate reports of the transactions of the checking account in question. Primarily Gulley argues that because the charts did not reflect every transaction which would have included other deposits as well as additional expenditures, they were misleading and confusing to the jury. Gulley further contends that the trial court erred in determining that the charts were admissible and that Gulley's objections were matters for cross-examination. Gulley asserts that the charts left the jury with the erroneous impression that Gulley used his clients's money to pay his personal expenses.
¶ 26. Interestingly, Gulley does not object that the charts do reflect some of the transactions, deposits and withdrawals of the checking accounts in question. In fact, Gulley testified at trial that the monies of the seven investors were in fact deposited into the Magnolia Federal checking account in issue.
¶ 27. Gulley also charges in his appellate brief a discovery violation by the State. Gulley claims that the bank records used to produce the charts were not provided to him in a timely fashion. This matter was addressed by the trial court. Erikson and her staff entered all the bank statements of the Gulley's accounts into a computerized spreadsheet. According to the State and Erikson, the spreadsheets contained every transaction of the accounts in question from the beginning date the account was opened until it was closed. Gulley was provided copies of the charts and the spreadsheets from which the charts were made three months prior to trial. In addition, the State asserted that the documents were available for Gulley to inspect at the district attorney's office.
¶ 28. Gulley, however, complains that he did not get to see and check for accuracy the actual bank statements from which the spreadsheets and subsequently the charts were made. The documents make up several legal sized boxes and consist of many records. Defense counsel requested and the trial court granted a two hour continuance of trial for defense counsel to examine the records. When asked whether or not a two hour continuance would be sufficient, counsel for Gulley stated:
There's never enough time, but I mean, under the circumstancesI don't want to delay this trial or aggravate this jury any longer than possible, but I have to ensure that Mr. Gulley does get a fair trial if there's something there. I think that [the two hour continuance] would be sufficient under the circumstances, Judge.
*1149 After the continuance, the trial court asked counsel for Gulley if he was able to review the documents in question. Counsel responded:
Your Honor, we have reviewed them some, again late. There are a lot of volumes to them. We haven't completed the review, but I understand the Court's earlier ruling. And I guess, basically at this point, if they call the witness, I may be able to ascertain as to whether or not the other review is critically required.
Given counsel's acquiescence to the trial court's decision to grant the continuance and his statement that he would essentially speak up if he believed a further continuance of trial was required, we see no discovery violation which has prejudiced Gulley's case such that he did not receive a fair trial.
¶ 29. Next, Gulley contends that the summary charts contained inadmissible hearsay which was prejudicial to and adversely affected "his rights," presumably to a fair trial. In addition, Gulley challenges that reversible error occurred in the trial court's failure to perform a Mississippi Rules of Evidence Rule 403 "balancing test."
¶ 30. The State argues that the trial court properly allowed the charts into evidence and that the trial court did not abuse its discretion in admitting the charts. In support of its position, the State contends that in fact the records of the bank accounts reflected on the charts were so voluminous that the charts were required to better serve the jury in deciding the case. The State asserts that the summary charts assisted the jury in understanding the flow of money through the Magnolia Federal checking account.
¶ 31. Mississippi Rule of Evidence 1006 provides:
The content of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.
Under Mississippi Rule of Evidence 1006, "a summary of the voluminous material is sufficient as admissible evidence." M.R.E. 1006 cmt. The standard by which the Mississippi Supreme Court reviews a trial judge's decision to admit evidence was reiterated in Stewart v. Stewart, 645 So.2d 1319, 1320 (Miss.1994):
The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused.... Unless the trial judge's discretion is so abused as to be prejudicial to a party, this court will not reverse his ruling.
¶ 32. "Summaries of voluminous evidence are admissible under M.R.E. 1006, according to the trial court's discretion." Farris v. State, 764 So.2d 411 (¶ 82) (Miss.2000). "Reversal of a trial court's evidentiary findings may only occur when there is a demonstrable abuse of the trial court's discretion." Id. (citing Johnston v. State, 567 So.2d 237, 238 (Miss.1990)).
¶ 33. Following our examination of the record and the charts, we are unable to say that the trial court abused its discretion in admitting the summary charts. The charts do reflect some of the transactions from the accounts provided. The maker of the charts explained each chart in her testimony indicating that the charts reflected only some of the transactions from the accounts and not every transaction in the accounts was depicted. Even further, the jury was provided the bank statements and checks that were reflected in the charts.
¶ 34. Regarding the allegation of a discovery violation, we find that the trial court did not err in refusing to grant a mistrial. Having discussed the matter with counsel out of the presence of the *1150 jury, the trial court granted a two hour continuance of trial to give defense counsel the opportunity to review the documents.
¶ 35. As to Gulley's complaint that the trial court did not conduct a Mississippi Rule of Evidence 403 balancing test, the record does not reflect that Gulley interposed an objection as to the relevancy of the evidence. Gulley objected to the admission of the charts based on inaccuracies he believed the charts contained. The trial court permitted counsel for Gulley to voir dire Erikson about her preparation of the charts. After hearing argument from counsel, the trial court overruled Gulley's objection to the admission of the chart stating that the problems Gulley had with the charts were matters for cross-examination.
¶ 36. Regarding Gulley's allegation that the charts contained inadmissible hearsay, the record fails to show a point at which Gulley lodged an objection to the charts on the grounds that they contained inadmissible hearsay. In addition, Gulley failed on appeal to point us to specific references in the charts where any such "hearsay" is found. Failure to lodge a protest to hearsay evidence at the trial level prevents us from considering the matter on appeal as we will not hold a court in error on a matter that was not presented for its review. Hall v. State, 691 So.2d 415, 420 (Miss.1997); see also Read v. State, 430 So.2d 832, 838 (Miss. 1983) ("[B]efore an issue may be assigned and argued here, it must first have been presented to the trial court. Where the issue has not been timely presented below, it is deemed waived. The point is thus said to be procedurally barred when urged here.").

3. Motion to dismiss indictment.
¶ 37. Gulley argues here that the trial court erred in denying his motions to dismiss the indictment because it contained a fatal flaw. Gulley contends that the indictment was defective because the proof at trial did not support the actual charges listed in the indictment. The seven counts of the indictment stated that Gulley allegedly embezzled and converted for his own use specific amounts of money of each investor. Gulley contends that the evidence showed that the checks of the listed investors were written out to Minnesota Mutual and not Doug Gulley. Accordingly, Gulley argues that the seven investors were not the so-called victims here, but rather that if anyone is, it is Minnesota Mutual. Minnesota Mutual assumed the business of Gulley & Associates pursuant to an agreement with Gulley. Subsequent to their assumption of the business, Minnesota Mutual repaid the investors the amounts of money they invested, with interest. Thus, Gulley asserts that based on Minnesota Mutual's restitution to his clients, any dispute as to amounts owed are between him and Minnesota Mutual and not the investors individually. Consequently, Gulley argues to this Court that the indictment which did not list Minnesota Mutual as the party injured by any of his actions was defective and the refusal of the trial court to dismiss his case was error.
¶ 38. "The question of whether an indictment is fatally defective is an issue of law and deserves a relatively broad standard of review by this Court." Nguyen v. State, 761 So.2d 873 (¶ 3) (Miss. 2000) (citing Peterson v. State, 671 So.2d 647 (Miss.1996)). In embezzlement cases, it is essential that it be stated from whom the property was embezzled. See Meyer(s) v. State, 193 So.2d 728 (Miss.1967); Voss v. State, 208 Miss. 303, 44 So.2d 402 (1950).
¶ 39. With the standard of review in mind, we are unpersuaded by Gulley's argument. The evidence showed that Gulley instructed his clients to make their checks payable to Minnesota Mutual. Gulley claims that he did so because that is the way the account was styled. However, looking at the signature card for the account into which Gulley placed the funds *1151 (account number XXXXXXXXXXXX) of these seven clients, we note that the card provides that the account is in the name of "C. Douglas Gulley or Elizabeth A. Gulley with JTROS D/B/A Gulley and Associates." Thereafter, Gulley, in most cases, immediately wrote checks on account number XXXXXXXXXXXX in large sums transferring money to other checking accounts including Gulley & Associates accounts held at South Trust Bank, Union Planters Bank, and Hancock Bank.
¶ 40. Other evidence submitted at trial does not support Gulley's assertion that the only victim in this case is Minnesota Mutual. Gulley presented at trial two letters from Minnesota Mutual. One was a 1985 letter to First City Federal Savings and Loan and the other was a 1991 letter to the Bank of Mississippi. Both letters gave Gulley authority to open a premium account/checking account on behalf of Minnesota Mutual on which Gulley would have signatory authority. Gulley testified that in 1991 he was approached by the Bank of Mississippi about doing business with the bank. According to Gulley, he moved the Minnesota Mutual premium account pursuant to Minnesota Mutual letter of authorization to the Bank of Mississippi. Gulley testified that the First City Federal Savings and Loan account is what is now referred to the Magnolia Federal account. Gulley indicated that the savings and loan bank went into bankruptcy and Magnolia Federal took over the account. Gulley claims that Minnesota Mutual was the only party who could authorize the closure of the Magnolia Federal account and that it was aware that the Magnolia Federal account was still in existence even after he had transferred the Minnesota Mutual premium account to the Bank of Mississippi. Gulley said that he requested that Minnesota Mutual allow him to maintain the Magnolia Federal account to use as a money management account. Gulley testified that he therefore kept the account active but did not use it as a Minnesota Mutual premium account.
¶ 41. Testimony at trial from Minnesota Mutual indicated that the company did not "own" the Magnolia Federal account and had no rights to access the account. Even more telling on the issue of whether Minnesota Mutual is the only "victim" here is the fact that Gulley drafted a letter to the bank giving it authorization to release to Minnesota Mutual any and all documents it requested pertaining to the Magnolia Federal account. If Gulley's claim that Minnesota Mutual actually owned the account in question were true, there would have been no need for a written authorization from Gulley for Minnesota Mutual to obtain information relating to the account. Further, whether or not Minnesota Mutual was the checking account owner is not relevant as the evidence shows that Gulley accepted the investors' monies, commingled it in an account from which he paid personal and business expenses and therefore, converted the money for his own use. Even if Gulley himself had paid the investors the money they had previously invested, such an action does not vitiate Gulley's conduct in wrongfully converting the funds for his own use.
¶ 42. Minnesota Mutual may be a "victim" in this case. However, the indictment does not list any losses of Minnesota Mutual and specifically refers to the clients and the amount of money Gulley was accused of embezzling from each.
¶ 43. Alternatively, Gulley contends that, at a minimum, counts one and seven should be dismissed on the basis that the proof at trial regarding the amounts invested were not consistent with the amounts provided in the indictment. As to count one, the indictment charged that Gulley accepted and embezzled $10,350 from Mr. James H. Bains. Gulley asserts that because Bains testified that he received $5,500 from Gulley before charges were filed against him, the indictment is factually defective making it fatally defective. As to count seven, the grand jury charged Gulley with receiving and embezzling $75,000 from William Hammack and *1152 Janice Parmelee. Gulley charges, however, that $16,000 had been returned to the client therefore making the indictment defective because the $75,000 investment was not reduced by the pay out of $16,000.
¶ 44. Again, we are not convinced. The fact that Gulley had previously refunded or returned portions of the investors' money is not relevant in this criminal case. The return of the funds does not negate Gulley's actions of illegally commingling and converting the funds for his own use.
¶ 45. We therefore rule that the trial court did not abuse its discretion in refusing to dismiss any part of the indictment against Gulley.

4. Motions for mistrial and cumulative effect of errors.
¶ 46. In his last assignment of error, Gulley advances that the trial court erred in refusing to grant his motions for a mistrial and alternatively that the cumulative effect of errors made throughout his trial denied him a fair trial. Consequently he contends that reversal of his case is required. Gulley points to trial court errors in allowing inadmissible testimony over defense objections. Gulley argues that the seven investors were "`tainted' by the statements, letters, and comments" of Minnesota Mutual, the Secretary of State's office, and the district attorney's office. Even further, Gulley asserts that these jurors "`presumably' read the prejudicial, inaccurate and inflammatory articles in the paper and/or saw reports on T.V."
¶ 47. In response, the State contends that because there is no merit in any of Gulley's assignments of error, there is no cumulative error.
¶ 48. "When the combination of specific errors, while harmless in each instance, accrued to such an extent that a defendant was denied a fair trial, this Court will reverse for cumulative error." Hughes v. State, 735 So.2d 238 (¶ 199) (Miss.1999). However, where "there was no reversible error in any part, so there is no reversible error to the whole." McFee v. State, 511 So.2d 130, 136 (Miss.1987).
¶ 49. In this case we have concluded that there was no error in any part. Accordingly, this assignment of error lacks merit.
¶ 50. THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY OF CONVICTION OF SEVEN COUNTS OF EMBEZZLEMENT AND SENTENCE OF TEN YEARS EACH ON COUNTS ONE THROUGH SIX, TO BE SERVED CONCURRENTLY, AND TEN YEARS ON COUNT SEVEN TO BE SERVED CONSECUTIVELY TO THE SENTENCES IMPOSED IN COUNTS ONE THROUGH SIX, WITH THE SENTENCE IN COUNT SEVEN SUSPENDED, AND TEN YEARS OF POST-RELEASE SUPERVISION, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND A FINE OF $7,000 IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., BRIDGES, IRVING, LEE, and THOMAS, JJ., concur.
CHANDLER and MYERS, JJ., not participating.
NOTES
[1] The record reflects that Union Planters Bank bought out Magnolia Federal. However, for consistency we will continue to refer to the primary account in question here as the Magnolia Federal checking account.