537 So.2d 1325 (1989)
Willie James HARRIS
v.
STATE of Mississippi.
No. 57653.
Supreme Court of Mississippi.
January 4, 1989.
*1326 Paul R. Scott, Wilroy & Scott, Hernando, for appellant.
Mike Moore, Atty. Gen. by DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
ROY NOBLE LEE, Chief Justice, for the Court:
Willie James Harris has appealed to this Court from a judgment entered in the Circuit Court of DeSoto County on a jury verdict finding him guilty of rape and sentencing him to life imprisonment in the custody of the Mississippi Department of Corrections without the benefit of parole. He has assigned three (3) errors in the trial below.

FACTS
On July 11, 1984, Julie Scott, 16 years old, and Marcie Scott, her twelve-year-old sister, were forcibly raped and badly beaten in their home in Southhaven, DeSoto County, Mississippi. The young girls were the only ones at home on the afternoon of that day. About 2 p.m. Julie was in the bathroom, about to take a shower, and Marcie was in her bedroom. Julie heard a loud banging noise at the front door, and, wrapped only in a towel, she left the bathroom and went to determine the cause of the noise. She discovered a young black man, approximately six (6) feet in height, wearing a green shirt and cut-off tan pants climbing through the shattered front-door window. The trespasser had a silver pistol in his hand. Julie screamed and attempted to lock herself in the bathroom, but was overpowered by the man. Marcie, hearing Julie's scream, started for her bedroom door, but was met there by Julie and her assailant. At gunpoint, he forced the girls into Marcie's bedroom. Over the next thirty minutes to one hour, he raped and beat both girls. While he assaulted one girl, he kept the other locked in the bedroom closet.
After the assailant raped Julie, he forced her to lead him through the house where he gathered money and other valuables. During this time, he repeatedly struck Julie on her head with his pistol. Julie collapsed, lapsing in and out of consciousness, but the beating did not cease. As she lay on the floor, the assailant stabbed her some twenty (20) times in the head, neck, back and abdomen with a long barbecue fork.
As Julie lay unconscious, the assailant took Marcie from the bedroom closet and beat her about the head with the butt of a shotgun that he had found in the house. The beating continued until the stock of the shotgun splintered into pieces. Marcie was then choked with a bed sheet until she lost consciousness.
Upon regaining consciousness, Marcie checked on her sister Julie and then went next door to the home of Mrs. Barbara Jones for help. Marcie was so bloody, bruised and beaten that Mrs. Jones did not even recognize her as her nextdoor neighbor. Finally, when she did determine Marcie's identity, Mrs. Jones let her in the house, sat her down, tried to help and called the police, an ambulance service, her husband, and the girls' parents. She then locked the front door of her house, took a pistol and went next door to see about Julie.
Mrs. Jones found the Scott house in disarray. The front door had been broken in. Blood was in Marcie's bedroom, on the floor, on the bed, in the living room, and in every part of the house where the assailant had taken the girls. She found Julie sitting on the commode in the bathroom, unclothed, bloody, practically all over, and *1327 semi-conscious. The commode bowl was red with blood. Blood was on the telephones where Marcie tried to call out.
The police, the Scott parents and ambulance arrived. Marcie was able to provide the police with a description of their assailant before she was taken to the hospital. The description was relayed to the dispatcher for police broadcast. After hearing the description given by Marcie Scott of the assailant, DeSoto County Sheriff James Albert Riley proceeded to Southhaven to investigate. While cruising the area, Sheriff Riley was approached by two unnamed men who claimed to have seen a young black man fitting the description of the Scott girls' assailant. They led Sheriff Riley to the home of Bobbie Jean Harris, mother of appellant Willie James Harris.
Appellant was at the house, and Sheriff Riley, joined by Southhaven Police Officer Bud Smith, briefly questioned appellant concerning the rape of the two Scott girls and the clothing described by Marcie. He denied any knowledge of the crimes and ownership of either a green shirt or tan cut-off pants, which Marcie said the assailant was wearing. About this time, a green shirt and bloody tan cut-off pants were produced from the house, either by the appellant's mother or aunt and were given to the police. The appellant was then placed under arrest and was advised of his Miranda rights.
On July 11, 1984, at approximately 6:40 p.m. appellant signed a waiver of rights form witnessed by Investigator Thomas McCloud and Deputy Sheriff Ray Richardson. Appellant then gave a confession in the presence of the above two officers and Deputy Sheriff Jack McCauley. The statement was tape recorded, transcribed and signed by appellant.
At approximately 1:30 p.m., on July 12, 1984, appellant signed another waiver of rights form which was witnessed by Investigator Jack Bartholemew and Investigator Jimmy Radford. Again, he gave a statement of confession to the assault and rape of the two Scott girls.
On August 15, 1984, an indictment was returned by the DeSoto County Grand Jury charging appellant Harris with the forcible rape of Marcie Scott in violation of MCA § 97-3-65(2). Beginning October 30, 1984, appellant was tried on that charge, and on November 1, 1984, after deliberating forty (40) minutes, the jury returned a verdict finding appellant guilty as charged and sentencing him to life imprisonment without the benefit of parole under MCA § 99-19-81.

LAW

I.

THE LOWER COURT ERRED IN DENYING APPELLANT'S MOTION FOR A CHANGE OF VENUE.
Prior to trial, on September 4, 1984, appellant filed a motion for change of venue, which was heard on September 5, 1984. The prosecution called to the stand four (4) supervisors of DeSoto County. The appellant called five (5) witnesses. The supervisors and three (3) of the five (5) witnesses called by the appellant testified that the appellant could receive a fair trial in DeSoto County.
Attached to the motion for change of venue as exhibits were nineteen (19) newspaper articles, which referred to the crime. Seven (7) of the accounts were from local publications, three (3) were from the Clarion-Ledger, three (3) were from the Commercial Appeal, and six (6) were from an unknown source. A certificate executed by the News Director of WREG-TV, Channel 3, Memphis, Tennessee, indicating that full coverage was provided by the television station of the arrest and preliminary hearings concerning appellant and that the coverage was aired on evening and nightly news broadcasts July 13 and 26, 1984; and a certificate executed by Dave Black, Jr., manager of WVIM radio, FM 95, Hernando, Mississippi, that the station provided full coverage by way of radio news broadcasts relating to the arrest and preliminary hearing of Willie James Harris and Barry Patterson, five (5) times, beginning subsequent to July 12, 1984, were entered into evidence.
*1328 An open letter from Representative Morris Lee Scott, DeSoto County, addressed to Governor William A. Allain, was among the publications. Although referring to the "alleged" rape, the emphasis of the letter was critical of the parole system in the State of Mississippi. Reference was made in one of the articles to a letter written by the Board of Supervisors, DeSoto County, to Governor William A. Allain criticizing the release of Harris on parole. The letter was not published.
Appellant was arrested July 11, 1984, indicted August 15, 1984, and trial began October 30, 1984. Fifteen (15) of the newspaper articles were published in July, 1984, and four (4) were published in August, 1984. The last article was published August 22, and a period of two (2) months elapsed before the October 30 trial.
At the conclusion of the hearing, the trial judge made a finding from the evidence, including live witnesses and exhibits, that, in his opinion, he could not in good conscious arbitrarily sustain the motion for change of venue, but, likewise, did not feel that he should overrule the motion for change of venue at that time, and reserved ruling until he reconsidered the motion at the conclusion of the voir dire and after having the benefit of observing those persons summoned for jury duty.
The court convened on October 30, 1984, for selection of the jury and for trial. Eighty-two (82) venire persons were present. The trial judge thoroughly interrogated and qualified them. The prosecutor and the defense attorneys extensively questioned them to determine whether or not they would be fair and unbiased jurors. Fifty-two (52) members of the venire had some knowledge of the case. The appellant challenged for cause eleven (11) jurors. The trial judge excused nine (9) of those eleven (11) challenged. Appellant exercised twelve (12) peremptory challenges, the State seven (7) challenges. Eleven (11) jurors had been selected at that point. The appellant did not request any additional peremptory challenges and the jury was accepted by the State and the appellant. Forty-five (45) jurors were left for consideration after the twelve (12) members of the jury were accepted. Again, the motion for change of venue was considered by the trial judge, and he stated the court had the opportunity to observe the jury panel, to listen to the response of the jurors under oath and to questions propounded by the court, the State and the defendant, and he overruled the motion for change of venue.
The case sub judice is not comparable to the facts on the venue question in Fisher v. State, 481 So.2d 203 (Miss. 1985) and Johnson v. State, 476 So.2d 1195 (Miss. 1985). In those cases, the county was saturated by media coverage, television, radio and newspaper. In Fisher, saturation included, in addition to a single sex-related murder, the rape murder of another young woman in the county, the rape of a third woman, Fisher had a previous rape conviction in Georgia and was on parole at the time. The evidence against Fisher, including evidence that he was guilty of the second rape/murder, was repeatedly included in media reports. In Johnson, the venue was the same as in Fisher. The same news media bombarded the county with stories and articles about Johnson.
On the issue of venue change, this Court will not disturb the ruling of the lower court where the sound discretion of the trial judge in denying change of venue was not abused. Wiley v. State, 484 So.2d 339, 342-43 (Miss. 1986); Cabello v. State, 490 So.2d 852, 854-855 (Miss. 1986); Weeks v. State, 493 So.2d 1280, 1285-87 (Miss. 1986); White v. State, 495 So.2d 1346, 1349 (Miss. 1986).
In United States v. Harrelson, 754 F.2d 1153 (5th Cir.1985), the Fifth Circuit Court of Appeals addressed the matter of obtaining an impartial jury and in rebutting a presumption of prejudice. There, the Court referred to the fact that the trial judge saw and heard the jurors and that it could be shown from the voir dire an impartial jury was selected. The Court said:
An appellant can demonstrate that prejudicial inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial *1329 jury. Proof of such poisonous publicity raises a presumption that appellant's jury was prejudiced, relieving him of the obligation to establish actual prejudice by a juror in his case. This presumption is rebuttable, however, and the government may demonstrate from the voir dire that an impartial jury was actually impaneled in appellant's case. If the government succeeds in doing so, the conviction will stand despite appellant's showing of adverse pretrial publicity. [Citations omitted].
754 F.2d at 1159.
We are of the opinion that the trial judge did not abuse his sound discretion in denying the motion to change venue and the assigned Error I is rejected.

II.

THE LOWER COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS STATEMENTS OF CONFESSION, AS HAVING BEEN THE FRUIT OF AN ILLEGAL ARREST, AND EXHIBIT 35-B AS HAVING BEEN THE FRUIT OF AN ILLEGAL SEARCH AND SEIZURE.
The appellant contends that the lower court erred in permitting introduction of his statements given to the police following his arrest, as well as the shirt and bloody cut-off pants found at his mother's home. He claims that the confessions and competency of the physical evidence were improperly admitted because his arrest was illegal and the confessions were a result of coercion and promises of leniency.
On September 12, 1984, a suppression hearing was conducted before the trial judge. Seven (7) police officers, who were involved in appellant's arrest, testified at the hearing. Appellant also testified in his own behalf. The testimony of the officers, who were involved in the arrest and in taking the several confessions, was to the effect that the arrest of appellant was made after either his mother or his aunt brought to Sheriff Riley appellant's green shirt and tan cut-off pants from inside appellant's mother's house. Sheriff Riley testified that Ms. Harris voluntarily searched her home and brought the green shirt and cut-off pants to him, at which time he placed the appellant under arrest, read him his Miranda rights, and transported him to the sheriff's office.[1]
All the officers involved in the confessions testified that the appellant was advised of his Miranda rights and waived them, and that the statements were free and voluntary. The appellant disputed the testimony of the officers and claimed that he was arrested before the physical evidence was found and that he was threatened and was promised leniency if he made the confessions.
The principle is elementary that the lower court's ruling on the admissibility of a confession will not be disturbed unless it is contrary to the overwhelming weight of the evidence. Wiley, 465 So.2d at 320. See also Herring v. State, 522 So.2d 745, 750 (Miss. 1988); Johnson v. State, 511 So.2d 1360, 1365 (Miss. 1987).
We are of the opinion that the evidence clearly supports the decision of the lower court. Therefore, assigned Error II is rejected.

III.

APPELLANT WAS DENIED A FAIR AND IMPARTIAL TRIAL DUE TO THE IMPROPER AND PREJUDICIAL CONDUCT OF THE STATE BEFORE THE JURY.
The appellant argues that the prosecuting attorney engaged in personal abuse and vilification of him and overstepped the bounds of proper legal argument before the jury. In his opening statement, District Attorney Bobby Williams, made the following comments:
And, you'll hear him, ladies and gentlemen, in his own words, ... describe to you those acts of depravation that this savage animal inflicted upon those helpless girls.
* * * * * *

*1330 Ladies and gentlemen, we welcome the opportunity to prove this animal guilty.
Appellant's counsel objected to the last statement, which was sustained by the lower court. In closing argument, Assistant District Attorney Taylor Buntin made the following statements:
[Harris] is a perverted degenerate that roamed the countryside of this county and preyed upon helpless and innocent children.
* * * * * *
[W]ould it be fair to society to have a man like this released after serving a few years of his natural life; would it be fair to turn this perverted, degenerate aloose [sic] to prey upon other innocent, young, twelve-year-old girls who live in our county or any other county?
* * * * * *
Does anybody here think that he's shown any remorse during this trial?
Apparently, not to be outdone, District Attorney Williams, in closing, remarked:
I suppose an apology is in order. You may think that's strange. You'll recall that I called [Harris] a savage animal Monday. I apologize to the animal kingdom.
* * * * * *
I suggest to you ... that the lawmakers in our land who say that life imprisonment is the maximum you can have, made a serious mistake.
* * * * * *
I suggest to you ... that this is the type of case where six of you ought to be coming out of that jury room with a verdict of life imprisonment before the other six even get in there.
Objections were timely made to the argument of Assistant District Attorney Buntin and District Attorney Williams and were sustained by the court. The lower court likewise instructed the jury to disregard those remarks.
In Reed v. State, 197 So.2d 811 (Miss. 1967), the Court said:
[A]ll courts are agreed that it is the power and duty of the trial court to see that the privilege of argument is not abused. And where the abuse in a given case has been of such a character and has run to such an extent that there could be no denial that the abuse has been extreme and intolerable, the duty of the judge is to interfere of his own motion.
197 So.2d at 816. See also Brush v. Laurendine, 168 Miss. 7, 150 So. 818 (1933).
Prosecutors should not indulge in personal abuse or vilification of the defendant. They should not permit themselves to be provoked into the use of language and descriptions unbecoming to dignified courts of justice. This Court has condemned arguments by prosecuting attorneys which referred to the defendant as "scum" and "a professional criminal," along with many other degrading terms. In Bridgeforth v. State, 498 So.2d 796 (Miss. 1986), the Court said:
The interest of the State of Mississippi is best served by the orderly rational lawful presentation of the facts and the law. That is the way the criminal justice system is designed to operate. Justice is not served by attorneys who use closing argument to express inflammatory personal ideas or engage in personal vilification. The purpose of closing argument is to enlighten the jury, not to enrage it. Where counsel lacks the self-discipline necessary to avoid arguments such as these, that discipline should be imposed by the trial judge from the bench. An otherwise orderly and fair trial can be instantly destroyed by such unprepared intemperate argument. The price that all of us must pay for these untimely flights of oratorical fancy is far too high.
Bridgeforth v. State, supra, at 801.
This Court has often held that jurors are presumed to follow the trial judge's instructions, such as were made here, telling the jury to disregard the remarks of counsel. Shoemaker v. State, 502 So.2d 1193 (Miss. 1987); Gray v. State, 472 So.2d 409 (Miss. 1985); Evans v. State, 422 So.2d 737 (Miss. 1982); Ratliff v. State, 317 So.2d 403 (Miss. 1975); Clanton v. *1331 State, 279 So.2d 599 (Miss. 1973). In addition to the principle announced above, we are convinced that had the trial judge overruled the objections and failed to instruct the jury to disregard them, the statements would have been harmless under the facts of this case. Probably, any juror who heard the witnesses testify, saw the physical evidence consisting of photographs, bent barbecue fork, splintered gun butt with which the victims had been stabbed and beaten, after having been raped  such a brutal and heinous crime  would not have been moved or prejudiced by the statements of the prosecuting attorneys. Without doubt, the State's evidence presented in this case would make a strong, courageous, person want to cry and would make a cowardly weakling want to jump up and fight like a tiger.
The assigned Error III is rejected.
AFFIRMED.
HAWKINS, P.J., and ROBERTSON, PRATHER, SULLIVAN, ANDERSON and ZUCCARO, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
NOTES
[1] Ms. Harris stated to Sheriff Riley that appellant no longer lived in her house.