# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-01606-SCT

*JONATHAN BARFIELD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/25/2008 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: BENJAMIN ALLEN SUBER |
| |     LESLIE S. LEE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA LYNN BLOUNT |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/03/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., RANDOLPH AND CHANDLER, JJ.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.     Jonathan Barfield was indicted for the murder of Tiffany Deanna Talley. On July 3-10, 2008, Barfield was tried in the Circuit Court of the First Judicial District of Harrison County for the December 27, 2006, shooting of Talley. The jury convicted Barfield of the lesser offense of manslaughter for Talley's death. The trial court sentenced Barfield to twenty years in the custody of the Mississippi Department of Corrections (MDOC). Barfield

now appeals from that conviction. Finding no error, we affirm the jury verdict and sentence of twenty years in the custody of the MDOC.

**FACTS**

¶2. Barfield testified on his own behalf at trial. According to Barfield, he met Talley while the two attended high school. They dated for approximately two years before Talley's death. At the time of the shooting, Barfield was living in his father's FEMA trailer in a park near Canal Road in Gulfport, Mississippi. He kept two guns in the trailer because he thought the trailer park was "pretty scary," and the police visited the park at least three times a week.

¶3. On December 27, 2006, after finishing basketball practice at Gulfport High School, Talley made several telephone calls to Barfield. Despite testimony to the contrary, Barfield denied that he and Talley had broken off their relationship on December 26, 2006, the day before the shooting. Barfield stated that as he was taking a shower, he answered Talley's telephone call. While speaking to Talley, Barfield heard banging on his front door. He wrapped himself in a towel and headed to the door. Barfield told Talley to "hold on" and put the telephone down on a table. Upon reaching the door, Barfield saw that someone was twisting the door knob and attempting to get into the trailer. The bottom lock was unlocked, while the top lock was locked. Barfield grabbed his .22 revolver from the table, and he planned to "surprise" whomever was at the door. He never looked out the window or tried to see who was trying to get into the trailer. Barfield had the revolver cocked and ready when he opened the door. Then, he saw Talley. According to Barfield, he was trying to uncock the revolver as Talley entered the trailer. Talley was not in the door "a good 30 seconds" when she bumped Barfield, which caused the pistol to accidentally fire. Barfield

2

said he was so shocked by the bang from the gun that he stepped outside and threw the revolver into an adjoining field. When questioned, Barfield stated that when he was trying to uncock the gun, the gun was angled upward, and when Talley had bumped into him, his hand was knocked upward as well.

¶4. When Barfield returned to the trailer, he saw Talley on the ground and thought that she had fallen to the ground to cover herself. He called Talley and told her to get up from the floor. At that point, Barfield stated, he saw blood. Barfield tried to stop the bleeding with a sweatshirt that Talley had given him for Christmas. At that point, Barfield called his father and then called 911.

¶5. Deputy Joseph Fore was the first law enforcement officer to respond to the 911 call. When he arrived, Barfield told him that "It was an accident. I didn't mean to shoot her, and I threw the gun over the fence." According to Deputy Fore, Barfield also stated that he and Talley had "got into a little argument, nothing big, and that they were playing with the gun. He said he had the gun cocked by his leg, pointed at the ground and they had bumped into each other and the gun went off and shot her in the face." Deputy Fore also described Barfield's demeanor as similar to "talking about the weather." Deputy Fore stated that Deputy Glen Roe, who arrived shortly after him, placed Barfield in handcuffs while Deputy Fore checked on Talley. When Deputy Fore entered the trailer, he observed Talley face down in a pool of blood. On a nearby coffee table in the living room, Deputy Fore saw two boxes of .22 gun shells. On cross-examination, Barfield denied telling Deputy Fore that the gun was pointed toward the floor. In fact, he stated that the gun was pointed in an upward direction.

3

¶6.    While in the police car, Edward Twomey, former criminal investigator for the Harrison County Sheriff's Department, questioned Barfield about the shooting. Barfield told Twomey that Talley had stopped by his house before work, that she had shoved Barfield as she walked by him, and the gun fired. Later that day, Twomey conducted a second interview with Barfield, which included a taped statement. Twomey characterized Barfield's interview as "inconsistent." According to Twomey, Barfield told him that when he had seen Talley at the door, Barfield had lowered the gun down by his side, and had the gun pointing at the floor. When Talley bumped Barfield, he heard an explosion as the gun fired.

¶7.    When confronted with the location of Talley's wound, Barfield then told Twomey that he "must have dropped the gun because he was holding it lightly, and that it must have hit the floor and went off." Also, Twomey testified that Barfield initially stated that someone was banging loudly and knocking on the door, but later stated that someone just turned the knob to see if the door was open. Barfield also gave inconsistent information concerning the disposal of the weapon, according to Twomey. Barfield first stated that he had disposed of the gun after he had shot Talley, but later stated that he had disposed of the gun after calling his father and before the paramedics arrived at the scene. Barfield told Twomey that he threw the gun because, "that's what had killed Talley."

¶8.    At trial, there was conflicting testimony as to whether Barfield and Talley were together and the nature of their relationship. A question arose concerning whether Barfield and Talley had broken up on December 26, 2006, the day before the shooting. According to Barfield, the relationship between the two of them was "just fine," and they had been still together on December 27, 2006. Barfield described their relationship as "[p]retty much a

4

regular relationship like anybody else, you have ups and downs, but for the most part everything was okay."

¶9.     Felicia Shaw, Talley's aunt, testified at trial that she had spoken to Talley on the telephone the morning of her death.[1]  According to Shaw, Talley was taking something over to "Johnny's" (Jonathan Barfield's) house.  Talley said they had broken off their relationship. Talley told Shaw that she was taking this item back to Barfield to show him that it was over for sure this time.[2]  Shaw stated that Talley and Barfield had broken off their relationship on more than one occasion in the past.  When Shaw asked Talley if the relationship was over this time, Talley replied "Yes, this is it.  This is the last time."

¶10.    Walter Jackson, a former co-worker of Talley's, testified about the status of Barfield's relationship with Talley.  Jackson had worked with Talley at the Nike Outlet Store in Gulfport.  He had known Talley six or seven months prior to her death.  He said Talley had described her relationship with Barfield as being "rocky" and that "there was a lot of on and off."  Talley also told Jackson that she was still with Barfield because she was scared to leave him and because she was unsure of what he was going to do.  When asked what she meant by that, Talley told Jackson that Barfield had said that if he could not have her, then, no one could have her.  She made this statement approximately one week or so before her death.

¶11.    Julisia Taylor, Talley's friend since the sixth grade, testified about Talley's relationship with Barfield.  Julisia saw Talley at basketball practice the morning Talley was

---

[1]  There was no record of Talley having used her cell phone to call Shaw, but Shaw's phone records were not put into evidence.  Twomey testified that Talley could have just used another phone.

[2]  Shaw never asked, and Talley never said, what item she was returning to Barfield.

shot. At basketball practice, Talley told Julisia that she and Barfield had broken up and that it was serious this time. Talley did not tell Julisia that she was going to see Barfield later that day.

¶12. Dr. Paul McGarry, a forensic pathologist, testified about the injuries that Talley sustained and her cause of death. He described Talley's injury as a gunshot wound that entered her face at the center of her right cheek in line with the tip of her nose. The bullet went backward and upward at a forty-five degree angle and leftward at a twenty-five degree angle toward the top left of her head. The bullet was recovered from Talley's brain. Around the entry wound, Dr. McGarry found stippling on the skin, or powder particles embedded in the skin. According to Dr. McGarry, stippling is indicative of a close-range gunshot wound. Dr. McGarry estimated that the gun would have had to be twelve to eighteen inches away from Talley to cause the stippling. The stippling was in an upward oval pattern, which indicated that the bullet entered the head in an upward direction and went leftward and backward. With the type of injury Talley sustained, Dr. McGarry estimated that she would have lived only minutes. He stated that the cause of death, within a reasonable degree of medical certainty, was a close-range gunshot wound that entered her right cheek, perforating her brain and causing massive hemorrhaging and aspiration on her own blood.

## DISCUSSION

### I. Photographs.

¶13. Barfield argues that the photographs admitted into evidence were gruesome and unfairly prejudicial. In particular, Barfield argues that the trial court erred by admitting State's Exhibit 6 into evidence. State's Exhibit 6 was an enlarged photograph of the injuries

to Talley's head, with an inserted probe showing the trajectory of the bullet. Barfield's claim, however, is procedurally barred for failure to object to the introduction of the photograph into evidence at trial. When the State introduced the photographs at trial, Barfield failed to make any objection, and even replied to the trial court "No objection" prior to its admission into evidence.[3] "Failure to make a contemporaneous objection waives an issue for purposes of appeal." *Jones v. State*, 962 So. 2d 1263, 1270 (Miss. 2007) (citing *Spicer v. State*, 921 So. 2d 292, 305 (Miss. 2006)). Barfield's claim is procedurally barred for failure to make a contemporaneous objection.

¶14. Notwithstanding the procedural bar, Barfield's assertions are without merit. As a general rule, the admission of photographs is within the discretion of the trial court; "[a]dmission of photographs by the trial court is reviewed for abuse of discretion." *Chamberlin v. State*, 989 So. 2d 320, 340 (Miss. 2008). This Court must consider whether the pictures were so gruesome and inflammatory as to lack any evidentiary purpose and, therefore, be inadmissible. *McFee v. State*, 511 So. 2d 130, 134-35 (Miss. 1987).

¶15. "Some probative value is the only requirement needed in order to support a trial judge's decision to admit photographs into evidence." *Chamberlin v. State*, 989 So. 2d at 340 (quoting *Jones v. State*, 920 So. 2d 465, 476-77 (Miss. 2006)). However, "gruesome photographs which have no evidentiary purpose and which only arouse the emotions of a jury should not be admitted." *Sharp v. State*, 446 So. 2d 1008, 1009 (Miss. 1984). While

---

[3] [State]:    Your honor, we'd move number 6 into evidence at this time.
The Court: Defense?
[Defense]:  No objection.
The Court: It may be marked as State's 6 into evidence.

reversal for the admission of gruesome and/or cumulative photographs is rare, we have advised judges and prosecutors to "use great caution in this area." *Holliday v. State*, 455 So. 2d 750, 752 (Miss. 1984). This Court has held that photographs have evidentiary value when they "(1) aid in describing the circumstances of the killing; (2) describe the location of the body and cause of death; [and] (3) supplement or [clarify] witness testimony." *McIntosh v. State*, 917 So. 2d 78, 83 (Miss. 2005) (citations omitted).

¶16.    Barfield cites *Welch v. State*, 566 So. 2d 680 (Miss. 1987), and *Hewlett v. State*, 607 So. 2d 1097 (Miss. 1992), as authority.   In *Welch*, Joseph Ray Heath was killed by multiple severe trauma. *Welch*, 566 So. 2d at 681.  Heath sustained repeated blows to the head "with a 'buddy bar,' which is a large three-foot long iron bar, weighing sixty or seventy pounds." *Id*. When Heath's body initially was discovered, it was face-down with arms outspread, and partially clothed. *Id*. At trial, various photographs of Heath's dissected body were admitted into evidence. *Id*. at 685.  This Court held that the photographs of the victim's dissected cadaver had no probative value. *Id*.  The *Welch* Court found that the photographs "do not show the circumstances surrounding the death, the cruelty of the crime, the place of the wounds, or the extent of the force or violence used" and "were extremely unpleasant and used in such a way to be overly prejudicial and inflammatory." *Id*.

¶17.    The admission of State's Exhibit 6 at Barfield's trial is easily distinguishable from *Welch*.  The dissected cadaver in *Welch* was not indicative of the state of Heath's body at the time of its discovery, but rather its state during the autopsy process.  The photograph introduced into evidence as State's Exhibit 6 was not of a "dissected cadaver," but a photograph of the victim's face showing the gunshot wound and a rod inserted into the head

8

to show the trajectory and angle of the bullet. Unlike *Welch*, the photograph placed before the jury depicted every aspect that the Court held the photographs in *Welch* lacked. State's Exhibit 6, as explained by Dr. McGarry to the jury, showed the location of the wound, the stippling of gunshot powder, indicative of a close-range gunshot, the path and upward trajectory of the bullet and corresponding upward stippling of the gunpowder, the passage of the bullet through the right internal carotid artery and brain, which caused extensive bleeding, and the disruption of the sinus, showing the path from which the blood flowed over the face. This Court has held that, although photographs may be unpleasant, mere unpleasantry does not establish reversible error. *See Noe v. State*, 616 So. 2d 298, 303 (Miss. 1993) ("A photograph, even if gruesome, grisly, unpleasant, or even inflammatory, may still be admissible if it has probative value and its introduction into evidence serves a meaningful evidentiary purpose.").

¶18. Barfield also relies on *Hewlett v. State*. In *Hewlett*, three family members died when Hewlett's vehicle hit their vehicle and burst into flames. *Hewlett*, 607 So. 2d at 1099. The trial court admitted two photographs depicting the charred bodies of two of the victims. *Id*. at 1101. Barfield is correct in his assertion that this Court stated, "[p]hotographs of a victim should not ordinarily be admitted into evidence where the killing is neither contradicted nor denied, and the corpus delicti and the identity of the deceased have been established." *Id*. at 1102. However, the very next sentence of the opinion states, "Photographs may nevertheless be admitted into evidence in criminal cases where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory. *Id*. (citing *Sudduth v. State*, 562 So. 2d 67, 70 (Miss. 1990)). Further,

9

"photographs used to support testimony of witnesses have been accepted as relevant and their admission as evidence was not an abuse of discretion." *Id*. (citing *Lanier v. State*, 533 So. 2d 473, 484 (Miss. 1988)). This Court ultimately affirmed the trial court's admission of the photographs of the charred bodies, because they depicted the bodies as "viewed at the scene by the medical examiner" and they supplemented and clarified his testimony at trial. *Id*.

¶19.    Again, *Hewlett* is easily distinguishable. Here, the State introduced the photograph during the testimony of Dr. Paul McGarry, a forensic pathologist. The photograph was used by Dr. McGarry to show the path the bullet traveled as it took the life of Talley. The photograph was also used to show the stippling, or powdered particles embedded in Talley's skin. Dr. McGarry stated that the stippling was indicative of a close-range gunshot within twelve to eighteen inches. This evidence was significant because contradictory evidence was provided by testimony from other witnesses as to Barfield's statements concerning the position of the gun at the time it fired and shot Talley. Contrary to the testimony of law enforcement officers, Barfield denied making any statement to law enforcement that the gun was pointed in a downward position or that the gun must have slipped and struck the ground, causing it to fire when Talley bumped into him as she entered the trailer. As the photographs were used to help the jury better understand the testimony of Dr. McGarry and the circumstances and cause of the shooting, they were clearly relevant. Likewise, pursuant to Mississippi Rule of Evidence 403, the probative value of these photographs was not substantially outweighed by the danger of unfair prejudice.

¶20.    Additionally, Barfield used the photographs in the cross-examination of Dr. McGarry. Barfield's counsel had Dr. McGarry hold the photograph for the jury to see, in order to

10

explain the upward angle of the path of the bullet when it struck and killed Talley. Had counsel for Barfield seen these pictures as being more prejudicial than probative for his client, surely he would have sought to limit the jury's exposure. Instead, he used the pictures himself while cross-examining Dr. McGarry and brought additional attention to the probe which had been inserted into the wound.

¶21. The trial court did not err by admitting the photograph, Exhibit 6. Barfield failed to contemporaneously object, and the issue is procedurally barred. Alternately, Barfield's argument is without merit, as the photograph served an evidentiary purpose, was not unduly prejudicial, and, therefore, was properly admitted at trial.

**II.  Venue**.

¶22. Barfield asserts that he was denied the right to a fair trial due to the publicity generated by his case in and around Harrison County. He contends that the trial court abused its discretion by denying his motion for a change of venue.

¶23. This Court recently addressed a change-of-venue issue in *Welde v. State*, 3 So. 3d 113 (Miss. 2009). "The decision to grant or deny a motion for change of venue is within the discretion of the trial judge." *Id*. at 118 (quoting *McCune v. State*, 989 So. 2d 310, 316 (Miss. 2008)). This Court has held that "[a] motion for change of venue 'must be in writing and supported by affidavits of two or more credible persons showing that the defendant cannot receive an impartial and fair trial in that particular county because of prejudgment of the case or grudge or ill will to the defendant in the mind of the public.'" *Gray v. State*, 799 So. 2d 53, 62 (Miss. 2001) (quoting *Davis v. State*, 767 So. 2d 986, 993 (Miss. 2000)). When the application for a change of venue is filed, along with two supporting affidavits

11

stating that the defendant is unable to receive a fair trial in a particular area, a presumption arises that an impartial jury is unattainable. *Welde*, 3 So. 3d at 118; *see also* Miss. Code Ann. § 99-15-35 (Rev. 2007).

¶24.   Barfield did satisfy the requirements of a "proper application" in that he did file a motion with two attached affidavits alleging that Barfield could not receive a fair trial due to the publicity of the case. Upon this showing by Barfield, the burden then shifted to the State to rebut the presumption that Barfield would not be able to receive a fair trial.

¶25.   This presumption, however, may be rebutted by the State upon proof that an impartial jury was empaneled during voir dire. *Holland v. State*, 705 So. 2d 307, 336 (Miss. 1997). In *Gray* this Court stated:

> This Court enumerated "certain elements which, when present would serve as an indicator to the trial court as to when the presumption is irrebuttable." *White*, 495 So. 2d at 1349. The elements are as follows:
>
> (1)   capital cases based on considerations of a heightened standard of review;
> (2)   crowds threatening violence toward the accused;
> (3)   an inordinate amount of media coverage, particularly in cases of
>   (a)   serious crimes against influential families;
>   (b)   serious crimes against public officials;
>   (c)   serial crimes;
>   (d)   crimes committed by a black defendant upon a white victim;
>   (e)   where there is an inexperienced trial counsel.
>
> *Id*.; *Davis*, 767 So. 2d at 993-94; *Baldwin v. State*, 732 So. 2d 236, 241 (Miss. 1999)*; Burrell*, 613 So. 2d at 1189-90.

*Gray*, 799 So. 2d at 62.

12

¶26. First, the factors set forth by this Court to determine whether the presumption is irrebuttable are inapplicable to the facts of Barfield's case because: (1) this was not a capital case; (2) no crowds had threatened violence against Barfield; (3) the amount of media coverage, which will be discussed in further detail, had not been inordinate, and the case had not been: (a) against an influential family; (b) against a public official; (c) a serial crime; (d) a black defendant against a white victim; and (d) trial counsel was not inexperienced.

¶27. Nonetheless, this Court will address the amount of media coverage, due to the number of exhibits filed by Barfield. Exhibits A-L all are newspaper articles submitted by Barfield in support of his motion for a change of venue. All of the articles asserted that Barfield had been charged in the death of Talley, but none specifically stated or implied that Barfield was guilty. Only one article seems to have come close to this assertion, Exhibit A. An article by the *Biloxi Sun Herald* quoted friends of Talley as saying that she had told them she was afraid to break up with Barfield, afraid he would kill her. The article read, "she may have been right." Some articles, however, such as Exhibit B, another article by the *Sun Herald*, reported Barfield's explanation that the gun had fallen from his hand, discharging upon impact with the ground. In all, the articles stuck to undisputed facts such as Barfield's arrest and manslaughter charge. (The manslaughter charge eventually was upgraded to murder.) These articles fail to meet the requirement of an "inordinate" amount of media coverage.

¶28. However, to better understand the meaning of "inordinate," this Court may look at how the Court ruled in *Harris v. State*, 537 So. 2d 1325, 1329 (Miss. 1989).[4] The *Harris*

---

[4] *Harris* also was used for comparison in *Holland v. State,* 705 So. 2d 307, 336-37 (Miss. 1997). In *Holland*, despite twenty-nine newspaper clippings and thirteen clips from

case involved far more publicity than in Barfield's case. Yet the Court found that an impartial jury still could be empaneled. *Id*. at 1329. *Harris* involved a brutal rape covered at least twice by television and by nineteen newspaper articles. *Id*. at 1327. Here, only twelve news stories from both newspaper and television were designated as exhibits. Also, at venire in *Harris*, fifty-two of eighty-two venire persons had some knowledge of the case. In the present case, only thirteen of the sixty venire persons stated that they had read the prior media coverage, and those who had seen media coverage advised the trial court that they could still be impartial. During voir dire, only one member of the selected panel answered that she had seen the media coverage of the case prior to the trial. The juror also told the court that the media coverage would not affect her verdict and that she could rely on what she heard in the courtroom to decide the case.

¶29.   "[H]owever, the State can rebut this showing by proving from voir dire that the trial court impaneled an impartial jury." *Harris v. State*, 537 So. 2d at 1329 (quoting *United States v. Harrelson*, 754 F.2d 1153, 1159 (5th Cir. 1985)). If the State demonstrates such, this Court will not overturn the trial court's finding that an impartial jury could be found, despite adverse publicity. *Id*. This Court reviews the trial court's finding under an abuse-of-discretion standard. *Id*. In any case, this Court will treat with deference a venire person's assertions of impartiality. *Scott v. Ball*, 595 So. 2d 848, 850 (Miss. 1992).

---

the local television station, the Court held that an impartial jury still could be impaneled.

14

¶30. As revealed in the record, the totality of the voir dire conducted by the trial court and counsel resulted in the seating of a fair and impartial jury, thus rebutting the presumption that an impartial jury could not be obtained by Barfield. Accordingly, this issue is without merit.

### III. THE *WEATHERSBY* RULE

¶31. Barfield next argues that the trial court erred by denying his motion for directed verdict, and he was entitled to an acquittal based on the *Weathersby* Rule. *See Weathersby v. State*, 165 Miss. 207, 209, 147 So. 481, 482 (1933). After the State rested, Barfield requested a directed verdict based, in part, on the *Weathersby* Rule. He asserts that his version of events was reasonable and not substantially contradicted in material particulars.

¶32. The *Weathersby* rule states:

> It has been for some time the established rule in this state that where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Weathersby*, 147 So. at 482.

¶33. However, this Court has provided some guidance for circumstances in which the *Weathersby* Rule would be inapplicable where a defendant was the only eyewitness to a homicide. *See Johnson v. State*, 987 So. 2d 420, 425 (Miss. 2008). "[I]f the defendant or the defendant's eyewitnesses' testimony satisfies all the elements of murder or manslaughter, the defendant would not be entitled to a directed verdict of acquittal, as their testimony would be the basis for a valid conviction." *Id*. In addition, the *Weathersby* Rule is inapplicable where: (1) "the defendant's version is patently unreasonable, or contradicted by physical

15

facts"; (2) "where the accused, following the slaying, gives conflicting versions of how the killing took place"; and (3) where the accused "initially denies the act." *Id*. (quoting *Blanks v. State*, 547 So. 2d 29, 33-34 (Miss. 1989)). When a defendant is the sole eyewitness to the killing and the *Weathersby* Rule does not apply, the question "then becomes a jury issue as to whether to believe or not believe the defendant's testimony of how the slaying occurred, and to either convict or acquit." *Id*. (quoting *Blanks*, 547 So. 2d at 33-34).

¶34.    "Motions for a directed verdict and judgment notwithstanding the verdict challenge the legal sufficiency of the evidence, and the standard of review for a directed verdict and judgment notwithstanding the verdict are identical." *Nelson v. State*, 10 So. 3d 898, 905 (Miss. 2009). "[T]he critical inquiry is whether the evidence shows 'beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" *Jones v. State*, 904 So. 2d 149, 153-54 (Miss. 2005) (quoting *Carr v. State*, 208 So. 2d 886, 889 (Miss. 1968)). This Court has further stated:

> In analyzing the sufficiency of the evidence, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jones v. State*, 904 So. 2d 149, 153-54 (Miss. 2005) (citing *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). This Court "accept[s] as true all of the evidence that is favorable to the State, including all reasonable inferences that may be drawn therefrom, and ... disregard[s] evidence favorable to" [the defendant]. *Anderson v. State*, 904 So. 2d 973, 977 (Miss. 2004).

*Moore v. State*,  996 So. 2d 756, 760-61 (Miss. 2008).

¶35. We find that this case properly was decided by a jury. Despite Barfield's assertion that his testimony was uncontradicted, the evidence presented showed otherwise. The evidence showed inconsistencies as to the placement of the gun at the time of the shooting, the disposal of the gun, and the nature of the relationship between Barfield and Talley. "Where conflicting stories are given about a homicide by the accused, the *Weathersby* Rule does not apply." *Fairley v. State*, 871 So. 2d 1282, 1284 (Miss. 2004).

¶36. When Deputy Fore arrived at the scene, Barfield told him that the shooting was an accident, he did not intend to shoot Talley, and that he had thrown the gun over a fence. Barfield also told Deputy Fore that he and Talley "got into a little argument, nothing big, and that they were playing with the gun. He had the gun cocked at his leg pointed at the ground and they bumped into each other and the gun went off and shot her in the face." When Investigator Twomey questioned Barfield at the scene, Barfield gave no indication of a "little argument" between himself and Talley. While in the patrol car, Barfield told Twomey that Talley had stopped by the trailer, she had shoved him, and the gun fired. At a second interview, Barfield told Twomey that when he had seen Talley, he had lowered the gun down by his side, and it was actually pointing toward the floor.

¶37. When questioned about the location of the gunshot wound on Talley's face, Barfield changed his version of events. Twomey stated that Barfield, confronted with the fact that Talley had suffered a wound to the face, stated that he "must have dropped the gun because he was holding it lightly, and that it must have hit the floor and went off." Twomey also stated that Barfield was inconsistent concerning the disposal of the gun. Barfield first told Twomey that he had disposed of the gun after shooting Talley. Later, Barfield stated that he

17

had disposed of the gun after he had called his father, but prior to the arrival of paramedics to the scene.

¶38. Dr. McGarry testified concerning the wounds that Talley had sustained and the cause of death. By all indications, Dr. McGarry's testimony indicated that the gun was pointed in a upward direction and was fired at close range. Specifically, Dr. McGarrry testified that the bullet that entered Talley's right cheek was angled in an upward position. The bullet's trajectory was upward at a forty-five degrees angle and toward the left at a twenty-five degree angle toward the top and left of Talley's head. Furthermore, Talley's face had stippling in a left, upward pattern. This stippling pattern indicated that the bullet had entered in an upward and left direction. The stippling also indicated a close-range gunshot wound. Dr. McGarry estimated that the gun was between twelve and eighteen inches from Talley when it was fired.

¶39. Numerous witnesses also testified concerning Talley and Barfield's relationship. Twomey stated that Barfield had described his relationship with Talley as enduring. However, Shaw stated that Talley and Barfield had broken up on more than one occasion. Talley had told Shaw that she was taking something back to Barfield and that the relationship was over this time. The morning of the shooting, Talley had told Taylor, her childhood friend, that she and Barfield had broken up the relationship and that she was serious about it. In addition, Jackson stated that Talley had described her relationship with Barfield as "rocky" and "on and off." Talley also told Jackson that she was afraid to leave Barfield because she did not know what Barfield would do about it. Approximately one week before

18

her death, Talley told Jackson that Barfield had stated that if he could not have her, then, no one could have her.

¶40.    We find that Barfield's account of the event was not reasonable and that it was substantially contradicted sufficiently to give rise to a jury question. Therefore, the trial court did not err in denying Barfield's motion for a directed verdict.

¶41.    Additionally, sufficient evidence supported the jury verdict of manslaughter in this case. Barfield was convicted by the jury of the lesser offense of manslaughter in lieu of the indicted charge of murder. Manslaughter has been defined by the Legislature as "[T]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense . . . ." *See* Miss. Code Ann. § 97-3-35 (Rev. 2006).

¶42.    While the evidence is contradictory on a number of issues, Barfield admitted shooting Talley with his .22 revolver when she entered his home. The evidence showed that Barfield stated to Deputies Fore and Roe and Investigator Twomey at the scene that Talley's death was an "accident." Barfield told Deputy Fore that when Talley initially had come to the trailer that they had "a little argument, nothing big, and that they were playing with the gun."

¶43.    The testimony also showed that the position of the gun was at issue. Barfield stated that his testimony was consistent because he always had stated that the gun was pointed in a upward direction when Talley had bumped into him. He claimed that there were no contradictory statements from him, and any statements to that effect were merely responses to theories posed to him by law enforcement officials.

19

¶44. Viewing the evidence in the light most favorable to the verdict, a rational trier of fact, the jury in this case, could have found the essential elements of manslaughter beyond a reasonable doubt. Therefore, Barfield's issue is without merit.

### IV. Weight of the Evidence.

¶45. Barfield argues that the jury's verdict was against the overwhelming weight of the evidence, therefore, the trial court erred by denying his motion for new trial.

¶46. A new-trial motion challenges the weight of the evidence. *Wilkins v. State*, 1 So. 3d 850, 854 (Miss. 2008). This Court will reverse only if the trial court abused its discretion in denying a motion for new trial. *Massey v. State*, 992 So. 2d 1161, 1164 (Miss. 2008). This Court has stated:

> When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997). The evidence should be weighed in the light most favorable to the verdict. *Id*.

*Jones v. State*, 904 So. 2d 149, 154 (Miss. 2005). On questions of witness testimony, this Court has held that "[t]he jury determines the weight and credibility to give witness testimony and other evidence." *Moore v. State*, 933 So. 2d 910, 922 (Miss. 2006) (citing *Johnson v. State*, 904 So. 2d 162, 167 (Miss. 2005)). This Court "may not 'pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief.'" *Id*. (quoting *Davis v. State*, 568 So. 2d 277, 281 (Miss. 1990)).

20

¶47. Without reiterating all the evidence recited in Issue III above, and viewing the evidence in the light most favorable to the verdict, this Court cannot say that the verdict of manslaughter is so contrary to the overwhelming weight of the evidence that to allow the conviction to stand would sanction an unconscionable injustice.

¶48. Barfield admitted shooting the gun and causing Talley's death. The jury heard the conflicting testimony of Barfield's account of the shooting and placement of the gun as opposed to the testimony of law enforcement officers who questioned Barfield concerning the facts of the shooting. The jury also heard the testimony of Dr. McGarry and saw the physical evidence concerning the angle of the bullet and subsequent stippling and injuries that Talley suffered from the gunshot wound, indicating an upward trajectory of the bullet. The jury also heard conflicting evidence concerning Barfield's and Talley's relationship.

¶49. After hearing all the evidence, including the conflicting evidence, the jury resolved the evidence in favor of a conviction against Barfield of the lesser offense of manslaughter. Accordingly, this issue is without merit.

**CONCLUSION**

¶50. For the foregoing reasons, this Court affirms the conviction of manslaughter and the sentence of twenty years in the custody of the MDOC.

¶51. **CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED**.

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, LAMAR, KITCHENS AND PIERCE, JJ., CONCUR.**

21