# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-00319-COA

HOUSTON LEE JONES A/K/A HOUSTON JONES                      APPELLANT

v.

STATE OF MISSISSIPPI                                         APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/22/2013 |
| TRIAL JUDGE: | HON. ROBERT P. KREBS |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | ANTHONY N. LAWRENCE III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF DELIBERATE-DESIGN MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 06/23/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., ISHEE AND CARLTON, JJ.**

**ISHEE, J., FOR THE COURT:**

¶1.     In 2013, Houston Lee Jones was convicted in the Jackson County Circuit Court of deliberate-design murder and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). Aggrieved, Jones now appeals his conviction on four grounds: (1) the jury was improperly instructed on deliberate-design murder; (2) Jones was prejudiced by hearsay testimony; (3) the circuit court erred in excluding one of Jones's

statements to the police; and (4) the weight and sufficiency of the evidence did not adequately support the conviction. Finding no error, we affirm.

## STATEMENT OF FACTS

¶2.     Jones, an eighteen-year-old father of a new baby girl named Ryleigh, was living with his sixty-four-year-old stepgrandfather, Leo Landrum, in 2011. Jones's parents had separated when he was a young boy, and his father had gained primary custody of him. Nonetheless, prior to his mother's suicide in 2010, Jones lived with each parent during various time periods. When Jones reached high-school age, he began living with Landrum. Landrum was Jones's mother's stepfather until his divorce from Jones's grandmother. Hence, Jones had been around Landrum often from the time he was a small child until Landrum's death.

¶3.     The evidence shows that Landrum financially supported Jones throughout Jones's life. Jones even admitted that Landrum had always showered him with gifts. By the time Jones was eighteen, Landrum had purchased four vehicles for him. At the time of Landrum's death, Jones was an unemployed father. Hence, in addition to Landrum paying all of Jones's bills, he also began giving Jones money to help support Ryleigh. However, given all of the expenses Landrum was covering, he was rapidly falling into dire straits financially. Landrum's sister-in-law, Katherine Landrum, helped Landrum with his finances and was even listed on his bank account as an account holder.

¶4.     The day before Landrum was murdered, Katherine testified that Landrum told her that Jones had maxed out all of his credit cards and that he was going to have to stop supporting Jones financially. According to Landrum's bank account, he only had approximately $2,000

2

when he died, despite windfalls totaling almost $150,000 from various sources over the years. Landrum's neighbor and best friend, Jimmy Spicer, also testified that he had coffee with Landrum every morning. He testified that while the two of them were visiting the morning of Landrum's death, Landrum said that Jones had reached his credit limit on all of his credit cards. He also testified that Landrum said Jones needed to "straighten up and work."

¶5.    Jones asserts that Landrum's financial support of him was due to Landrum's alleged sexual molestation and assault on Jones for a number of years. Jones's recollection of the abuse is inconsistent. In some statements, it appears that Jones could not remember when the abuse began or the extent of the abuse. In other statements, Jones recalled the exact age, location, and description of the abuse in vivid detail.

¶6.    On May 25, 2011, Jones shot and killed Landrum. He then used Landrum's cell phone to call his girlfriend, who is also Ryleigh's mother, Tilena Womack, to ask for permission to visit with friends that evening. After Womack gave him permission, he went to a friend's house for some time. Around 11:30 p.m., Jones volunteered to drive one of the friends home, and several other friends accompanied him in the car. On the way back, Jones said he needed to stop at Landrum's to retrieve an overnight bag so that he could stay out that night.

¶7.    Upon arriving at Landrum's house, Jones stated that Landrum's front door was locked. Kyle Keener, one of the passengers in the vehicle, testified that he found this to be unusual since he was under the impression that a lock had broken off in the door years earlier

3

and, thus, Landrum never locked the front door. Regardless, Jones asked Keener and the two other passengers in the vehicle to accompany him to the back door to enter the home. The boys all complied. They soon discovered that the back door was standing open. After calling for Landrum by name with no response, Jones asked Keener to go into the home first. When Keener entered the house, he and the other boys found Landrum dead in his recliner from a bullet wound. They immediately called 911 and waited for emergency responders at a nearby church.

¶8.     When authorities initially questioned Jones about the shooting, he claimed he had no involvement and did not know anything about it. However, Jones later admitted that he shot Landrum after confronting him about the alleged sexual abuse. Jones also provided conflicting testimony regarding a purported incident wherein Jones claimed Landrum touched Ryleigh's genital area inappropriately. One of Jones's statements indicated that he had seen Landrum touching Ryleigh's genitals. However, in another statement, Jones said he "suspected" that Landrum may have "done something" to Ryleigh's genital area because it was red and producing an odd-colored discharge. Nonetheless, Womack disputed the notion, claiming that on the day Jones asserted the abuse to Ryleigh occurred, she was with Jones and Landrum all day, and that no abuse occurred.

¶9.     At trial, the jury heard testimony from many witnesses, including Katherine, Spicer, Keener, and Womack. The jury was also privy to numerous statements from Jones given to authorities after he was arrested. After being instructed as to deliberate-design murder and heat-of-passion manslaughter, the jury returned a guilty verdict for deliberate-design murder.

4

Jones now appeals.

## DISCUSSION

### I.      Deliberate-Design-Murder Instruction

¶10.    Jones first asserts that the jury was improperly instructed by the circuit court on deliberate-design murder. The State argues that because Jones's counsel failed to object to the instruction at trial, the issue is procedurally barred. It is well settled that "an offended party's failure to object to jury instructions at trial procedurally bars the issue on appeal." *Neal v. State*, 15 So. 3d 388, 397 (¶13) (Miss. 2009) (citation omitted). Accordingly, we are without authority to address this assignment of error.

### II.      Introduction of Landrum's Statement

¶11.    Jones next argues that the statements made by Landrum to Katherine and Spicer regarding his intent to stop supporting Jones financially were inadmissible hearsay. He also claims that since the testimony highlighted his financial irresponsibility, it served as evidence of his "bad character," and was, therefore, inadmissible under Mississippi Rule of Evidence 404(a).

¶12.    Mississippi Rule of Evidence 803(3) provides that a statement is not prohibited by the hearsay rule if it is "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . . ." The State asserts that Landrum's statements were introduced to show his intent to cease financial support of Jones and were, therefore, permissible. We agree.

5

¶13.    We have previously held that "[s]tatements which indicate an intent or plan to do something in the future are admissible to prove that the proposed act occurred." *Bogan v. State*, 754 So. 2d 1289, 1293 (¶14) (Miss. Ct. App. 2000).  Such statements inherently create an alternative motive for Jones to have killed Landrum aside from the allegations of abuse. While Jones provides numerous distinguishable cases where statements of intent were not allowed due to the hearsay rule, it is important to note that the contextual relevancy of each statement reviewed for admissibility under the hearsay rule by a circuit court differs on a case-by-case basis.  Here, Landrum's discussions with a family member and a close friend on the eve and morning of his death regarding his intent to stop financing his soon-to-be killer were relevant for the jury to review.

¶14.    Furthermore, Jones's claim that the statements were inadmissible under Rule 404(a) as statements of bad character against him is invalid.  This claim has been raised for the first time on appeal, and, hence, is not reviewable by this Court.  *See Tate v. State*, 912 So. 2d 919, 928 (¶27) (Miss. 2005).  Procedural bar notwithstanding, the issue is also without merit.

¶15.    Rule 404(a) specifically holds that "[e]vidence of a person's character or a trait of his character is not admissible *for the purpose of proving that he acted in conformity therewith on a particular occasion*." (Emphasis added).  Here, the statements presented to the jury only sought to establish Landrum's intent to stop financially supporting Jones, not to prove that Jones failed to support himself financially.  The State never put on any evidence or argued to the jury that Jones was, in fact, financially irresponsible.  Hence, the statements Jones opposes could not have been introduced for the purpose of showing that Jones acted in

conformity with Landrum's statements and was, in fact, financially irresponsible. The issues regarding the introduction of Landrum's statements to Katherine and Spicer are meritless.

### III. Exclusion of Jones's Statement

¶16. Jones's next issue on appeal centers around the third statement he made to authorities on June 1, 2011, several days after being imprisoned. His first statement was made to Lieutenant Randy Muffley on May 25, 2011, just hours after Landrum's body was discovered. At that time, Jones denied any knowledge of or involvement in Landrum's murder. Two days later, on May 27, 2011, Jones admitted that he had shot and killed Landrum. In that statement, he told police that Landrum had molested him for many years as a boy. However, he could not remember details of the alleged abuse. He also claimed that he noticed "an abnormal color discharge" coming from Ryleigh's vagina after Landrum babysat her shortly before his murder. Jones claims he then suspected that Landrum may have touched Ryleigh inappropriately. On the night of the murder, Jones asserted that he confronted Landrum about Ryleigh and also about his own abuse. Jones stated that when Landrum ignored him, he shot and killed Landrum.

¶17. Jones was arrested and jailed after his May 27 statement to authorities. Five days later, on June 1, 2011, he gave another statement to police very similar to his May 27 statement. Nonetheless, in the June 1 statement, he went into far more detail regarding Landrum's purported abuse of him as a boy.

¶18. At trial, the State offered both the May 25 and the May 27 statements into evidence. The State did not offer the June 1 statement into evidence. However, prior to calling

Lieutenant Muffley to the stand to testify, the State advised the circuit court that it believed Jones's counsel would attempt to offer Jones's June 1 statement into evidence on cross-examination. The State objected to the introduction of the statement on the basis that a defendant is prohibited from introducing an out-of-court, self-serving statement, as well as a cumulative statement, that the State does not first introduce during its case-in-chief. After hearing arguments from both sides, the circuit court recessed to view the statement and analyze the applicable caselaw. The circuit court recessed and agreed that the June 1 statement was self-serving and inadmissible.

¶19. In particular, the circuit court cited *Simmons v. State*, 805 So. 2d 452, 489 (Miss. 2001), in support of its decision. In *Simmons*, the supreme court noted that as "a general rule[,] . . . declarations of a party in his own favor are not admissible in his behalf." *Id.* at (¶95) (citation omitted). The supreme court went on to say:

> A self-serving declaration is excluded because there is nothing to guarantee its trustworthiness. If such evidence is admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence.

*Id.* (citation omitted).

¶20. We agree that Jones's June 1 statement was self-serving and inadmissible. Jones had already given two statements to the authorities – one of which discussed the abuse Jones alleged Landrum inflicted on him. The June 1 statement was merely a rehashing and more detailed account of the abuse that provided no further credible information to the case and could only have been given to serve him later in his defense.

8

¶21. Furthermore, even if the statement had been introduced, it would have contradicted Jones's testimony at trial. In the June 1 statement, Jones asserted that the alleged abuse never progressed to actual intercourse. However, at trial, Jones testified that Landrum escalated the abuse to intercourse several years after the assaults began. Additionally, in the June 1 statement, Jones could not remember when the alleged abuse began. Conversely, at trial, Jones testified as to exact ages, circumstances, and specific details about the abuse, including the first attack. Finally, in the June 1 statement, Jones told authorities he merely suspected that Landrum may have done something improper to Ryleigh. At trial, Jones testified that he walked into Landrum's home and saw him fondling Ryleigh – a fact disputed by the June 1 statement and by Womack's testimony. Hence, even if the exclusion of the statement was error, it was harmless error at best. Accordingly, this issue is without merit.

### IV.    Jones's *Weathersby* Claim

¶22. Jones next argues that the circuit court improperly denied his request for a directed verdict since he was the only eyewitness to the crime and his story was not substantially contradicted. Jones grounds his claim in the *Weatherbsy* rule, created by the supreme court in *Weathersby v. State*, 165 Miss. 207, 209, 147 So. 481, 482 (1933), when it stated:

> [W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the [S]tate, or by the physical facts or by the facts of common knowledge.

However, the supreme court later clarified that "if the defendant or the defendant's eyewitnesses' testimony satisfies all the elements of murder or manslaughter, the defendant

9

would not be entitled to a directed verdict of acquittal, as their testimony would be the basis for a valid conviction." *Barfield v. State*, 22 So. 3d 1175, 1185 (¶33) (Miss. 2009) (citation omitted). Since Jones admitted that he shot and killed Landrum, only murder and manslaughter were possible convictions. Hence, the *Weathersby* rule was not available for invocation. Additionally, Jones has failed to raise this issue previously, and, accordingly, it is procedurally barred. Hence, this issue is both procedurally barred and meritless.

## V.    Weight and Sufficiency of the Evidence

¶23.    In his final assignments of error, Jones alleges that the weight and sufficiency of the evidence do not support his conviction. In considering a claim regarding the weight of the evidence, this Court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d 836, 844 (¶18) (Miss. 2005). Furthermore, with regard to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 843 (¶16) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)).

¶24.    Here, the jury was privy to substantial witness testimony, including Jones's own testimony, and physical evidence regarding Landrum's financial condition, Jones's allegations of abuse, and the events leading up to, during, and after Landrum's murder. While Jones's defense of alleged abuse differs from the State's theory that his motive was financial, it was within the province of the jury to determine which story they believed and,

10

thus, whether a deliberate-design murder or heat-of-passion manslaughter conviction was proper. *See Nelson v. State*, 10 So. 3d 898, 905 (¶29) (Miss. 2009) (holding that a jury determines the weight and credibility of witness testimony). As such, we cannot find that either the weight or the sufficiency of the evidence was so lacking as to warrant reversal. This issue is also without merit.

¶25. **THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT OF CONVICTION OF DELIBERATE-DESIGN MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JACKSON COUNTY.**

**LEE, C.J., IRVING, P.J., BARNES, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR. MAXWELL, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**